G. FRANK DOUGHERTY, Plaintiff, *v.* NATIONAL CITY BANK OF NEW YORK, Defendant. (Actions Nos. 21, 26, 29, 32.)*

Supreme Court, Nassau County, March 21, 1935.

* Opinion published with permission of Mr. Justice DODD who appointed the referee to hear and determine.

*Engelhard, Pollak, Pitcher & Stern [G. Frank Dougherty, Walter H. Pollak and Frederic C. Pitcher of counsel], for the plaintiff.*

*Shearman & Sterling [Joseph M. Proskauer, J. Alvin Van Bergh, Carl A. Mead, P. A. Carroll and Frank A. F. Severance of counsel], for the defendant.*

TWEED (HARRISON), Referee. These are four actions to recover the unpaid balance of rubles in each of four deposit accounts opened with branches of the National City Bank in Petrograd and Moscow. These branches were closed in 1918. The primary theory on which the plaintiff seeks to recover is that while the deposits were originally payable at the Russian branches, nevertheless after the closing of these branches a deposit relationship existed between the depositor and the National City Bank as a whole and the deposits were

thereafter payable on demand at the bank's main office in New York; that the commencement of each action constituted a valid substitute for a demand; and that the cause of action to recover each of the unpaid balances accrued at the date when each action was commenced.

The plaintiff demands judgment for the value of each deposit at the date of the commencement of the action for its recovery. He claims that this value should be determined upon the basis of the value of the so-called chervonetz ruble which was in circulation at that time, rather than upon the basis of the rubles which were current at the time that the deposit was made or at the date of the closing of the Russian branches. He further claims that for purposes of the judgment the value of the chervonetz ruble at the time of the commencement of each action should be taken to be fifty-one and one-half cents per chervonetz ruble.

The deposit in Action No. 21 (Apraxin) was made at the Petrograd branch on May 11, 1917,* in the amount of 100,000 rubles. This deposit carried interest at three per cent. The unpaid balance with respect to this deposit was 100,000 rubles.

The deposit in Action No. 26 (Heuss) was made at the Moscow branch on December 12, 1917, in the amount of 500 rubles. Thereafter, from time to time additional deposits were made in this account so that the unpaid balance was 102,025 rubles. The account carried no interest.

In Action No. 29 (Samoyloff) $3,100 in cash was paid to the defendant at its head office in New York city on July 16, 1917, and pursuant to the agreement then made a deposit account in the Petrograd branch was opened, the dollars being converted at the rate of 23 cents per ruble, making a total of 13,478.26 rubles. This deposit carried interest at the rate of three per cent. The unpaid balance with respect to this deposit was 13,583.88 rubles.

The deposit in Action No. 32 (Charlet) was made at the Petrograd branch on September 3, 1917, in the amount of 110,000 rubles. This deposit carried interest at the rate of three per cent. The unpaid balance was 134,024.92 rubles.

All of the actions were commenced in the first four months of 1932.

The National City Bank obtained permission from the Imperial Russian government to open branches in Russia on January 5, 1917. The permission to do business was granted by a document called the Pravila, which was an enactment or decree of the Imperial Russian government. As translated, it is entitled " Rules for the operation of the Russian branches of the National City Bank of New York." In twenty-seven numbered paragraphs it prescribes

* Unless otherwise stated all dates are given in terms of the new style calendar.

the terms and conditions under which the Russian branches were to be operated. By paragraph I the Bank " in guaranty of its liabilities in connection with operation contracted in Russia, pledges all its personal property which it owns in the Empire and also all real estate * * *, and deposits with the State Bank a special guaranty fund " of 5,000,000 rubles.

Paragraph II reads as follows: " The said property and the deposit (Paragraph I) shall serve exclusively as a guaranty for the Bank's liabilities assumed in Russia; all these liabilities, in so far as they are not covered by said property and the deposit, are guaranteed, in addition thereto, by the capital stock and the reserves and all other property of the Bank."

Paragraphs V to VIII read as follows:

" V. In case of liquidation of the Russian branches of the Bank, the guaranty fund shall be returned to the Bank after full satisfaction of all liabilities incurred by the branches in Russia.

" VI. In case the Russian branches should not be able to satisfy the claims instituted against them, institutions and persons making such claims can demand, in the prescribed course, that said branches be declared bankrupt.

" VII. The branches being declared insolvent, the guaranty fund shall be applied exclusively to satisfying the creditors for business contracted in Russia. The demands not satisfied in this way have to be satisfied from the joint stock capital, reserves and other property of the Bank.

" VIII. In case The National City Bank of New York itself should be declared bankrupt, the claims arising from business contracted in Russia are to be satisfied out of the property and guaranty of the branches in accordance with Paragraphs VI and VII of the present rules."

Paragraph X provides that: " For the management of the business of the limited liability company under the style of ' The National City Bank of New York ' in Russia, a special responsible agent must be appointed with sufficient powers on behalf of the company. This agent shall:" and there follows a description of the powers and duties which the agent shall have.

Paragraph XI requires that correspondence concerning the business of the Russian branches and all communications with government and public institutions within the Russian Empire shall be conducted in the Russian language and that books, documents and other papers " required by government institutions and officials for the supervision and the operation of the Russian branches " must be kept in the Russian language.

Paragraphs XII to XXIV have to do with the nature of the business which the branches may do in Russia and how it shall be conducted, all of which is stated with great precision and detail.

Paragraph XXVII, which is the final paragraph, reads as follows: " In cases not provided for by the present regulations and also as regards the discontinuance of operations in the Empire, the Russian branches of the National City Bank of New York shall be subject to Russian laws and to the decrees of the Russian government, both those actually in force and such as may be promulgated in the future."

Pursuant to this permission the National City Bank opened its Petrograd branch on January 15, 1917. On March 12, 1917, the Imperial Russian government fell, and the Provisional or Kerensky government came into power. On November 7, 1917, the Kerensky government fell, and the Bolshevik government assumed control. On November 26, 1917, the National City Bank opened its Moscow branch.

On December 27, 1917, the General Executive Committee of the Workers and Peasants government adopted a decree for the nationalization of banks. This decree declared that the banking business was a State monopoly and that all existing banks were merged in the State Bank, which was to take over their assets and liabilities. This decree apparently applied to the National City Bank's branches only to the extent that, the banking business being a national monopoly, the branches were not permitted to accept any more deposits. The decree did not purport to merge the National City branches with the State Bank or to transfer its assets or liabilities to that bank.

Soviet troops occupied the Russian branches for a brief period, but were soon removed and the branches were permitted to pay out to depositors limited amounts of rubles. The branches continued in existence under these limitations as to withdrawals until August 26, 1918, when both branches were " officially closed " and on September 1, 1918, under the orders of the American Consul General and under escort of Soviet soldiers the American personnel left Russia. On this date the Russian branches had on deposit with the Peoples Bank (formerly the State Bank) 241,000,000 rubles and had outstanding deposit accounts of approximately 231,000,000 rubles.

On December 2, 1918, the Soviet of Peoples Commissaries adopted a decree for the liquidation of foreign banks. This decree did no more than provide in bare terms that foreign banks were subject to liquidation. There has been some dispute as to whether or not this decree contained a reference to an earlier decree of May 15,

1918. There were offered in evidence two forms of the decree of December 2, 1918, one with a preamble referring to a decree of May 15, 1918, " on the liquidation of foreign banks," and one which contains no reference to the earlier decree. Apparently both versions are official and both are in evidence. Neither plaintiff nor defendant has produced the decree of May 15, 1918, if there ever were one. There is no evidence as to the terms and provisions of any such decree.

On April 22, 1919, the Peoples Commissar of Finance published regulations for the liquidation of foreign banks. These regulations provided that pursuant to the decree of December 2, 1918, all foreign banks should be subject to liquidation. A period of a month was given for this liquidation to take place. The liquidation was to be carried out by a commission composed of the bank's manager, its head bookkeeper and a representative of its employees. The commission was to close out all accounts, to pay off first the indebtedness of the bank to the government and to the Peoples Bank, then to the Russian depositors and other creditors, and finally to the foreign creditors. The Russian depositors and creditors were to be satisfied by the entering of a credit in their favor to their current accounts in the Peoples Bank. The remainder of the assets were to be deposited in the Peoples Bank to the credit of the foreign bank. From this remainder the foreign depositors and creditors were to be paid, beginning with the most needy ones.

On January 19, 1920, a decree was adopted abolishing the Peoples Bank. This decree recited that the most important branches of production and distribution were in the hands of the State so that a State credit institution was no longer necessary. All the assets and liabilities of the bank were transferred to a government department which was authorized to carry out such former banking operations as still retained significance. On May 12, 1920, the Peoples Commissariat of Finance published a decree which provided that the deposits and accounts of private parties on the books of the Peoples Bank which had been opened prior to January 1, 1918, and in connection with which there had been no entries during the years 1918 and 1919 should be written off to the revenue of the Treasury.

On August 15, 1921, there was a decree of the Peoples Commissariat of Finance which refers to the liquidation regulations of April 22, 1919, and recites the expiration of the dates for the completion of the liquidation of foreign banks and states that the liquidation is in fact completed and that, therefore, no further liquidation activities are necessary.

The foregoing is an outline of all of the material events and governmental decrees other than those having to do with the currency. Consideration of the events and decrees having to do with the currency will be postponed.

Before discussing the merits of these actions a preliminary point must be disposed of. The defendant contends that the Supreme Court, Nassau county, has no jurisdiction over these actions by reason of the provision of the Banking Act of 1933 (Act of June 16, 1933, chap. 89, § 15; 48 U. S. Stat. at Large, 184; U. S. Code, tit. 12, § 632), which permits removal to the Federal District Court of an action to which a corporation organized under the laws of the United States is a party, and which arises out of transactions involving international or foreign banking. Petitions for removal were made in these actions and denied by the Supreme Court at Special Term on the authority of *Richard* v. *National City Bank* (6 Fed. Supp. 156), where it was held that the statute did not apply to cases already pending in the State courts at the time that the statute became effective. I assume that it was proper for the defendant to raise this jurisdictional question on the trial notwithstanding the decision at Special Term. I hold, however, that this court has jurisdiction, since the actions were commenced long before the Banking Act of 1933 became law. I, therefore, deny the motion.

As has been said, the theory of the plaintiff's primary cause of action is that the obligation of the National City Bank to the depositor which was created as a result of the deposit was such that after the closing of the Russian branches a deposit relationship existed between the depositor and the home office of the defendant in New York and that the deposit was payable there. The defendant denies that it was under any such obligation or that any deposit relationship ever existed between the depositor and the home office of the bank.

The defendant has moved to dismiss each of the complaints. It has also set up a number of affirmative defenses which the plaintiff has moved to strike out. The defendant also contends that its obligation, if any, was to pay in rubles of the Imperial Russian government and not in chervonetz rubles, which, it claims, are a different currency. Finally, it contends that even if its liability is to be determined upon the basis of the chervonetz ruble, the value of that ruble for purposes of converting its liability into dollars is not fifty-one and one-half cents as claimed by the plaintiff.

As I view these cases, the fundamental issue is whether a deposit relationship existed between the depositor and the home office of the bank at the time that each action was commenced. The oral arguments and the briefs of counsel for both parties seem to recog-

nize that unless the plaintiff can establish his theory of the relationship, any cause of action which he may have had was barred by the Statute of Limitations at the time he commenced the suits. It is recognized, in other words, that the plaintiff must establish that when he commenced these actions in 1932 a deposit relationship existed between the depositor or his assignee and the defendant. The reason for this is that if that relationship existed, the Statute of Limitations ran only from the demand, which in these cases was made by the commencement of the actions. Subdivision 2 of section 15 of the Civil Practice Act creates an exception to the general rule that " where a right exists, but a demand is necessary to entitle a person to maintain an action, the time within which the action must be commenced must be computed from the time when the right to make the demand is complete." The exception is that " where there was a deposit of money not to be repaid at a fixed time but only upon a special demand   *   *   *   the time must be computed from the demand."

I turn then to the question whether a deposit relationship existed between the depositor and the home office of the defendant at the time that each action was commenced.

The facts upon the basis of which a deposit relationship between the depositor and the home office of the bank must be created, if at all, are these: The National City Bank, which was a national banking institution, having its main office in New York city, desired to open a branch or branches in Russia in 1917. It received permission to do so from the Federal Reserve Board and from the Imperial Russian government by the governmental enactment or decree called the Pravila, the provisions of which have already been stated. Subsequent to the enactment of the Pravila and the opening of first the Petrograd and then the Moscow branch, the plaintiff's assignors made deposits with one or the other of these branches. There is no suggestion that there was any written or oral agreement concerning the deposits or that anything was said or done except the payment of money by the depositor to the branch, the acceptance of this money by the branch, the issue of what may be called a bank book indicating the amount of the deposit, and the making of entries on the books of the branch. The plaintiff says that the result of what was thus done was that after the events in Russia and the closing of the Russian branches a deposit relationship existed between the depositor and the home office of the bank. He cannot point to any provision in any instrument or any statement in any conversation which created this relationship as a matter of contract. On the record before me, if it was created at all it must have been created by the law. If and

when created by the law, it might, pursuant to the legal imagination and as a legal fiction, be called an implied term of the deposit contract. But it would, nevertheless, be a creation of the law.

The only law which could create the deposit relationship relied on by the plaintiff would be the law of the sovereign having jurisdiction to determine the rights and obligations of the parties to the deposit. The plaintiff asserts that the law of New York had such jurisdiction, to some extent at least, notwithstanding that everything that was said or done was said or done in Russia. He attempts to sustain his assertion on two grounds: *First,* that the recipient of the deposit was a corporation organized under the laws of the United States and having its principal place of business in New York; *second,* that New York was the second alternative place of payment and that the rule is that where there are two alternative places of performance the law of the second of these governs the contract.

The first ground is clearly insufficient under the authorities. It may be true that the law of the domicile of the corporation travels with it into foreign jurisdictions to the extent of limiting the power of the corporation to do certain things, to enter into certain contracts, or even to have certain obligations imposed upon it as the result of certain acts. It is not true, however, that the law of the domicile of the corporation has jurisdiction to determine the legal consequences of acts performed in territory subject to the law of another sovereign. (*Hutchison* v. *Ross,* 262 N. Y. 381; *Dougherty* v. *Equitable Life Assurance Society,* 266 id. 71; Restatement of the Law of Conflict of Laws, §§ 332, 373.)

The second ground assumes the correctness of the conclusion and then relies upon it as a premise. New York was an alternative place of performance only if the law of some sovereign having jurisdiction in the premises so declared. The question is whether the law of New York had such jurisdiction. That question is not solved by saying that under New York law, New York would be an alternative place of performance.

The truth, as the authorities referred to establish, is that the law of Russia is the law which had jurisdiction to determine what rights, obligations and relationships were created by the acts of the parties in Russia and what happened there. This applies to the Samoyloff action as well as to the others. The deposit in that action was equally governed by the laws of Russia although it was established as a consequence of arrangements made in New York. It is not suggested that either Soviet law or Kerensky law created any deposit relationship between the depositor and the home office. Thus the real issue is whether the law of Imperial Russia at the time of the deposit created, full-fledged at that time, or inchoately,

so that it came into being upon the happening of subsequent events, a deposit relationship between the depositor and the home office of the National City Bank. No Imperial Russian law has been proved other than the Pravila. The plaintiff argues that it is to be assumed that the Russian law was the same as the law of New York and that, therefore, proof of Russian law was unnecessary. In the light of *Riley* v. *Pierce Oil Corp.* (245 N. Y. 152) such an assumption cannot be made. In that case the plaintiff claimed that certain oil belonging to him and situated in Mexico was there converted by the defendant. There was no showing as to the law of Mexico. Because of this failure the Court of Appeals, in a *per curiam* opinion, affirmed a judgment dismissing the complaint, saying (p. 154): "A recovery in conversion is dependent upon proof of title in or a right of possession of the goods in question. Whether the plaintiff had either under the facts before us depends upon the law of Mexico. As to what that law may be we are given no information."

The issue then is narrowed to the question whether under the facts of these cases the Pravila created a deposit relationship between the depositor and the home office, existing at the time that the action was commenced. It is not over technical to so narrow the issue. In the first place, the plaintiff has the burden of presenting to the court the law which creates the obligation and relationship upon which he relies. He has presented only the Pravila. In the second place, the Pravila is the special law which prescribed the legal conditions under which the National City Bank was permitted to open its branches in Russia and, impliedly at least, the legal consequences of acts done by the branches. In the absence of something in the general law clearly and positively inconsistent with the provisions of the Pravila, those provisions must control. This is particularly true because one of the objects of the Pravila was to define the relative rights and obligations of the branches and the home office to the depositor.

There is nothing in the Pravila which expressly creates a deposit relationship between the depositor and the home office of the bank at the time of the deposit or under any circumstances. The creation of such a relationship cannot fairly be implied because from what is expressed in the Pravila the fair implication is to the contrary.

The branches were not, of course, corporate entities separate and distinct from the National City Bank, but they were something more than Russian " teller's windows." In the contemplation of the Pravila and for purposes of the transaction of business they were self-sufficient units. The Pravila makes a clear distinction between the branches, on the one hand, and the National City Bank on the other. This distinction stands out particularly in the provisions

concerning the respective liabilities of the branches and the bank itself. The obligation of the branches is treated as a primary obligation. It is secured by a deposit in the State Bank and by an exclusive pledge of all the bank's property in Russia to secure the liabilities arising out of the Russian business. The obligation of the bank itself is secondary. The only provision dealing with this obligation is that contained in paragraph II to the effect that the Russian liabilities " are guaranteed, in addition thereto, by the capital stock and the reserves and all other property of the bank." In letter and spirit this is only a further guaranty of the same nature as the guaranty by the deposit in the State Bank and by the pledge of the Russian assets. This further guaranty is not strictly a pledge, but very clearly the nature of it is a consent that the specified assets shall be liable. This is quite different from, and negatives the existence of, a deposit liability on the part of the bank as a whole. If the Pravila had contemplated that the National City Bank, as a whole, was under such a liability, there would have been no sense in inserting the provision permitting resort to the general assets of the bank. The fact that the National City Bank is made the guarantor to the extent that it consents that its general assets shall be liable if the Russian assets and deposits are insufficient, is, to my mind, conclusive that the Pravila did not create a deposit relationship between the depositor and the home office of the bank.

If the Pravila did not originally, either immediately or inchoately, create a deposit relationship between the depositor and the home office, there is no reason to conclude that such a relationship was created by any other law at the time when the Russian branches were closed. The only law which could have brought such a relationship into existence by reason of the closing of the Russian branches was the law of Soviet Russia. It is not claimed that the Soviet law did anything of the sort and no Soviet law on the subject is in evidence. In the nature of things Soviet law, calling for the application of the revolutionary conscience and the revolutionary interpretation of law, would not have created such a relationship.

Various letters written by the National City Bank in 1926 and thereafter to depositors were offered in evidence as admissions that a deposit relationship existed with the home office. One of these was written to Heuss, the plaintiff's assignor in Action No. 26, and was captioned " without prejudice." The rest were written to depositors whose claims are not involved in the cases before me. Some were, and some were not captioned " without prejudice." The purpose of these letters was to effect a settlement with the depositors. They implied " merely a desire for peace, not a concession of wrong done." (2 Wigm. Ev. [2d ed.] § 1061.)

I do not regard any of these letters as sufficient to constitute an admission of the existence of a deposit relationship with the home office. The subject-matter of the letters is the adjustment of "the accounts of the depositors of our Petrograd and Moscow branches." The defendant elects to close "any account" the depositor "*may* have with either of these branches." The letters continue that if the depositor has "any ruble obligation of any character" which he claims is due "from either branch" the depositor is asked to present proofs and that "upon the determination of the amount, if any, due you," the bank will pay in "Czar Ruble Currency in New York or will buy that currency at its present market value, although we are advised by counsel that we could discharge any ruble obligation by its payment in Kerensky Ruble Currency, which is practically worthless." The letters offer an alternative settlement on the basis upon which the bank might settle with the Russian government in connection with its own claims. The bank reserves the right in case neither proposal is accepted "to discharge any claim you may have by payment in Kerensky Ruble Currency." The letters conclude with the request that if the depositor wishes to enter into an agreement based on either alternative he should indicate the amount of rubles which he claims to be due to him "from our Russian Branches." I can find nothing in these letters which constitutes an admission that there was any deposit relationship between the home office and the depositors. In fact they seem to have been drawn so as carefully to avoid any such implication.

I hold that the primary cause of action based on the existence of a deposit relationship between the depositor and the home office of the defendant has not been sustained.

It may be that the complaints should be construed as setting forth secondary causes of action for breach of contract or for rescission and restitution, these being the causes of action sustained by the Court of Appeals in the first *Sokoloff* case (*Sokoloff* v. *National City Bank*, 239 N. Y. 158; opinion on motion for reargument, 239 N. Y. 171). If the complaints be so construed and if I may assume, pursuant to the apparent assumption of counsel for both parties, that the Russian law imposed an obligation to keep the branches open, I hold that the plaintiff has sustained this secondary cause of action; for there is no question that the Russian branches were closed on September 1, 1918, and have never been reopened. Therefore, as to such a cause of action, it becomes necessary to consider the defenses.

One of the defenses is the New York six-year Statute of Limitations contained in section 48 of the Civil Practice Act which is

limited by section 15. It is a good defense to a cause of action which relies upon the closing of the Russian branches in 1918, either as a breach of the deposit contract or as an excused default entitling the depositor to rescind the contract and have the amount of it restored to him on demand. (*Parker* v. *Hoppe*, 257 N. Y. 333.)

In Action No. 26 (Heuss) the plaintiff asserts that the letter written to Mr. Heuss by the defendant under date of August 17, 1927, tolled the statute. The substance of this letter has already been stated. It was marked " without prejudice." I have already found that this letter was not an admission by the defendant of a continuing deposit relationship. I hold that it is equally not an unqualified acknowledgment of liability. Only an unqualified acknowledgment of liability from which a new promise to pay may be presumed is sufficient to toll the statute. (*Lange* v. *National City Bank*, N. Y. L. J. Aug. 18, 1930, p. 2280; *Connecticut Trust & Safe Deposit Co.* v. *Wead*, 172 N. Y. 497; *Perlman* v. *Perlman*, 235 App. Div. 313.) The letter of August 17, 1927, very far from unqualifiedly acknowledging liability, refers only to " any * * * claim you *may* have " and asserts the right to discharge any such claim in " Kerensky Ruble Currency, which is practically worthless."

Strictly, it is unnecessary to consider the other defenses. However, for the sake of completeness and to assist counsel in the preparation of findings I shall state my conclusions with respect to the sufficiency of these defenses as applied to a cause of action for breach of contract or rescission and restitution. I cannot pass upon the validity of the defenses as applied to a cause of action based upon the alleged existence of a deposit relationship between the depositor and the home office of the bank. I have already found that no such cause of action exists. It is impossible to test the sufficiency of a defense as against a cause of action which merely might have existed under another state of fact and law.

The defenses which I shall consider allege in substance that the acts and decrees of the Soviet government in closing the branches, ejecting the personnel from Russia, appropriating all of the assets of the defendant in Russia, declaring the branches liquidated, and decreeing the rights of the depositors to be State property, excused the defendant from making any payment to the depositors.

I have had considerable difficulty in finding that the facts necessary to establish these defenses have been proved. The only evidence with respect to the closing of the Russian branches is the deposition of George B. Link and a stipulation. The stipulation states that on August 26, 1918, " the Moscow and Petrograd branches of the National City Bank of New York were officially closed, and under orders of the American Consul General, all the

nationals left for America by way of Finland and Sweden." So far as the stipulation is concerned, the closing might have been by the officials of the National City Bank, the officials in charge of the branches, the officials of the American Consulate General,. or the officials of the Soviet government. It is true that in *Sokoloff* v. *National City Bank* (250 N. Y. 69) the opinion of the Court of Appeals indicates that the closing by act of the Soviet government was either proved or conceded. However, in the two most recent decisions of the Court of Appeals the opinions make it very clear that the Credit Lyonnais, which was also a foreign bank having branches in Russia, remained open until June, 1920, and paid many of its depositors after September 1, 1918, and that the Equitable Life Assurance Society also maintained its Russian branches until 1920. (*Dougherty* v. *Equitable Life Assur. Society*, 266 N. Y. 71; *Smith & Bros. Typw. Co.* v. *Credit Lyonnais*, Id. 126.)

The Link deposition states that on August 26, 1918, Mr. Link and the whole personnel in Russia were arrested by soldiers of the Soviet government and taken to the Finnish border. This testimony, however, is scarcely sufficient to make it perfectly clear that the arrest and deportation of the personnel was an official closing by the Soviet government which prevented a continuation of the business of the branches and a participation in the subsequent liquidation proceedings. The fact that the personnel of the Credit Lyonnais and the Equitable Life Assurance Society remained in Russia and were permitted to do business, at least to some extent, and to take part in the liquidation proceedings, raises a doubt whether the ejectment of the personnel of the National City Bank was a governmental act inspired solely by the fact that they were conducting the business of a branch of a foreign bank and for the purpose of preventing a continuation of that business. However, in view of the concurrence of counsel for both parties that the closing was by act of the Soviet government and that the continuance of business would have been prevented by governmental force, I feel that I may properly so find. If that be the fact, then the failure of the personnel of the defendant to co-operate and participate in the liquidation proceedings is excused as a matter of law.

I hold that except in No. 29 (Samoyloff) these defenses are good at law against the secondary cause of action under the recent decisions in the *Equitable Life Assur. Society* and *Credit Lyonnais* cases. In *Dougherty* v. *Equitable Life Assur. Society* the officials of the Equitable took part in the liquidation provided for by the regulations of the Soviet Commissar of Finance of April 22, 1919, and this liquidation was completed. Thereafter the Equitable withdrew from Russia and wrote the Russian policies off its books.

The Court of Appeals held that this liquidation gave the Equitable a complete defense to actions against it on the policies because by the liquidation the obligation of the Equitable to its policyholders was extinguished under Russian law. The Pravila under which the Equitable was permitted to do business was interpreted as imposing upon the home office nothing more than an obligation to guarantee obligations existing under Russian law. The Russian obligation originally created by the Russian law having been extinguished by the law of the sovereign having jurisdiction in the premises, no obligation remained under the guaranty.

In the cases before me the terms of the Pravila are substantially similar to the terms of the Pravila under which the Equitable Life Assurance Society was permitted to do business in Russia. The secondary obligation of the National City Bank was equally a guaranty of the primary obligation of the branches. The liquidation decrees applicable to foreign banks purport to extinguish the obligation of foreign banks as effectively as the similar decrees applicable to life insurance companies. I have already stated that in my opinion the failure of the officials of the National City Bank to co-operate in the liquidation proceedings is excused. Consequently, for purposes of the decree of May 12, 1920, decreeing the rights of the depositors to be State property, I deem it immaterial that the deposits were never actually transferred to the books of the Peoples Bank in accordance with the liquidation regulations of April 22, 1919. The substance of the thing was that the Soviet government, which had actual and legal jurisdiction over the claims of depositors and the assets of the branches, wrote off those claims and appropriated those assets. To deny effect to what was thus done because of the failure of the defendant's officials to transfer the accounts of the depositors after the officials had been ejected by the Soviet soldiery would be to ignore the substance for a mere technicality. I conclude, therefore, that these defenses of the National City Bank are good as against the cause of action for breach of contract or rescission and restitution in all cases except Action No. 29 (Samoyloff).

In Action No. 29 the depositor paid in his money to the head office of the National City Bank of New York and the defendant agreed to convert the same into rubles and open an account for the depositor at its Petrograd branch. Thus the facts were practically identical with those presented in the first *Sokoloff* case (250 N. Y. 69). The opinion of the Court of Appeals in the *Equitable* case distinguishes the *Sokoloff* case on the ground that because the deposit was made in New York the Soviet decrees were not given effect. (266 N. Y. 71, 88.) I am bound by the decision of the

Court of Appeals in the *Sokoloff* case, and, therefore, hold that in Action No. 29 these defenses are insufficient as against the secondary cause of action for breach of contract or rescission and restitution. I so hold, notwithstanding that I think that if the question should become material and should again be presented on the basis of a more complete record, the Court of Appeals might feel called upon to consider the effect of the recent recognition of the Soviet government and perhaps to further analyze the nature of the transaction in New York with reference to whether the mere fact that the arrangements were made in New York is sufficient ground for denying effect to the Soviet decrees upon the deposit established in Russia.

Even if the plaintiff had established his primary cause of action based on the alleged deposit relationship between the depositor and the home office of the bank, still under *Dougherty* v. *Equitable Life Assur. Society* (266 N. Y. 71) and *Smith & Bros. Typw. Co.* v. *Credit Lyonnais* (Id. 126) he could have recovered nothing because the rubles to which he was entitled had become worthless.

The recent history of Russian currency, as it appears from the record before me, may be summarized as follows:

At the time that the National City Bank commenced to do business in Russia the Imperial government was in control and the Russian standard monetary unit was the ruble. The ruble was defined in terms of gold and was redeemable in gold, but the government, as a war measure, had suspended the right of redemption. At no time since then has it been possible to obtain gold for rubles.

When the Kerensky government assumed control in Russia, the old rubles of the Czarist government continued to circulate while the Kerensky government printed a large quantity of its own rubles. The two were supposed to circulate together as legal tender at par. The old Czarist rubles seem, however, to have been preferred by many people and to have circulated at a premium as against the Kerenskys. After the Soviet government was established in the fall of 1918, both the Imperial rubles and the Kerensky rubles remained in circulation until the spring of 1919. Meanwhile the Soviet government added to the flood of currency through the issuance of notes by the State Bank. On May 15, 1919, the Soviet government attempted to replace the old currency of the previous governments with its own. By a decree of that date it provided for the issuance of new credit notes of the pattern of the year 1918. These were to circulate throughout the country and to be legal tender on a parity with the old rubles. The Commissar of Finance was to withdraw the old rubles by exchange at par. It seems that this was never done. Subsequently, further patterns of rubles were issued apparently without offsetting withdrawals.

When the pattern for the year 1922 was authorized on November 3, 1921, a new attempt was made to salvage the currency, by issuing the 1922 rubles as equivalent to 10,000 of all previously existing patterns. In April, 1922, all accounting was ordered to be revised so that it should be in terms of the new rubles instead of the old. The decline continued so that when the 1923 rubles were issued they were made equivalent to 100 of the 1922 rubles and 1,000,000 of all the earlier issues.

Finally, in March, 1924, the chervonetz ruble was created to be issued as equivalent to 50,000 of the 1923 rubles. Rubles of issues earlier than the 1923 rubles were no longer to circulate as money and soon thereafter the 1923 rubles were themselves withdrawn. Since that time the chervonetz has been the only ruble circulating as money in Russia. The chervonetz was defined in terms of gold in language practically identical with that in which the old Imperial gold ruble was defined. The chervonetz rubles were to be backed by the deposit of precious metals and of foreign exchange in sufficient quantities to protect their value. It does not appear what the coverage for this guarantee is or has been.

The history of the ruble, as disclosed in the record in the cases before me, does not differ in any important respect from that disclosed in the record · in the *Equitable Life Assur. Society* and the *Credit Lyonnais* cases (266 N. Y. 71 and 126). The former of these cases raised the question of the right of the holders of or beneficiaries under life insurance policies written by the Equitable's Russian branches to be paid in chervonetz rubles. It was held that they were not entitled to do so. In the *Credit Lyonnais* case the plaintiff had deposited money with a Russian branch of the Credit Lyonnais. The cause of action alleged was based on a breach either at the time of demand for repayment of the deposit, which was when the action was commenced in 1923, or at the time of the closing of the Russian branch in June, 1920. The recovery in dollars would have been the value on the breach day of the rubles in which the deposits were repayable. Upon the authority of the *Equitable* case the Court of Appeals held that a claim for repayment in the current patterns of rubles could not be sustained and that the rubles in which the deposits were repayable were worthless.

The plaintiff urges that neither of these decisions establishes a broad principle, but that each should be limited to the particular facts of the case. He attempts to distinguish the cases before me on a number of grounds. In my opinion, none of the distinctions suggested by the plaintiff is sound. What I understand the Court of Appeals to have held is the general proposition that the new

Soviet rubles were different from the old Imperial ruble which had depreciated to nothing and that persons whose claims were created before the Bolshevik Revolution could not, after the establishment of the new Soviet rubles claim that they were entitled to be paid in those rubles at par.

Even in the absence of authority, it would be clear as a matter of common sense that obligations originally payable in the old rubles are not now payable in chervonetz rubles, either as a general proposition or in the facts of these particular cases. The plaintiff says that after September 1, 1918, a deposit relationship existed between the depositor and the home office, the effect of which was that the home office held on deposit a certain number of rubles to the credit of the depositor. This deposit relationship was created, if at all, long prior to the establishment of the chervonetz and while the old ruble was in circulation. Therefore, any original liability must have been in the old rubles. What happened was that those rubles depreciated until they became worthless.

There is no way whereby the depositor can convert his deposit into an obligation to repay in chervonetz rubles. The chervonetz ruble is a new and different currency. The mere fact that it happens to have the same name and statutory gold content is immaterial. The Soviet legislation does not make an obligation contracted in rubles payable in chervonetz. It does not establish parity. It did establish a ration until it recognized the worthlessness of the old issues and withdrew them from circulation. Thus the situation in which the chervonetz currency was established was that all previous issues of rubles had become worthless. Under such circumstances the Soviet government could not, in sanity, have declared that existing ruble obligations should be payable in the new chervonetz currency on a parity. That would have been to decree general bankruptcy or else to necessitate a new orgy of the printing presses which could only end in making the chervonetz ruble as worthless as the old rubles had been.

Even if the plaintiff had established that his claims were repayable in chervonetz he would have failed to establish that in 1932 the value of the chervonetz, for purposes of a judgment, was fifty-one and one-half cents.

On October 10, 1918, the Soviet government adopted a decree requiring all persons then having foreign currency in their possession without permission and all persons thereafter receiving foreign money, to exchange it for rubles at the official rates of exchange. Apparently this decree is still in effect. By a decree of March 21, 1928, all foreign exchange transactions were required to be made through certain enumerated government institutions and all other

transfers were prohibited. By these and other decrees the Soviet government attempted to establish a government monopoly of all transactions involving foreign exchange. The Soviet government in the administration of this monopoly has treated the chervonetz as a gold currency and has quoted it continuously at substantially its par value. Thus the government rate for purchase of rubles for dollars until the United States abandoned the gold standard was fifty-one and one-half cents. The government at this rate freely sold rubles for foreign currency but apparently it did not freely exchange foreign currency for rubles at the same rate. There was some testimony to the effect that in individual cases foreign currency had been obtained for rubles at the official rate but this testimony did not establish that this was the practice, and there was a great deal of testimony tending to show that it was not the practice. Certainly after August, 1918, neither in rubles nor in the subsequently issued chervonetz was there anything equivalent to foreign exchange as it ordinarily exists between countries whose currencies are allowed to find their level in the exchange market. Fifty-one and one-half cents is merely the price at which the Soviet government would sell rubles for dollars. It is not the value of the ruble in terms of dollars for purposes of a judgment here.

A large proportion of the testimony offered at the trial concerned this question of the value of the chervonetz. All of this testimony was admitted during the trial with ruling reserved as to its admissibility. My attitude with respect to this testimony is as follows:

Speaking generally, this testimony was of three types: *First*, it tended to show widespread transactions in Russia by which foreign currency of all kinds was exchanged for chervonetz at much below the official rate of fifty-one and one-half cents; *second*, testimony designed to show a considerable organization through which persons abroad might send money into Russia and by paying, outside of Russia, foreign currency, obtain the delivery in Russia of a number of chevonetz far in excess of those which could have been obtained through official channels at the official rate; *third*, testimony designed to show that persons holding foreign currency could, particularly through the Torgsin stores, obtain for their foreign currency far more and better goods than could be obtained outside the stores for the equivalent number of chervonetz at the official rate.

I find that the transactions testified to by which foreign currency was exchanged through bootleg channels in Russia were all illegal under Russian law. The decree of October 10, 1918, seems to provide that such transactions were illegal. There is no evidence that this decree was repealed. The continued existence of the decree or of its equivalent is indicated by the testimony of the witnesses who testified with respect to these bootleg transactions.

These witnesses refused to disclose the names of the persons with whom they dealt, and while most of them could not testify as to the law itself, all could testify and did testify as to the consequences which would follow if the Soviet authorities discovered the transactions.

I also find that the business testified to by which foreign money was deposited abroad and chervonetz delivered in Russia was illegal under Soviet law and that the entire business was designed to circumvent that law. The decrees restricting the import of rubles and foreign currencies are numerous.

Despite the illegality of the transactions so testified to, I now rule that the testimony is admissible, not as evidence that the price paid for chervonetz in either type of transaction was the fair market value of the chervonetz in foreign exchange; for such purpose, I deem the testimony incompetent. The testimony is admitted because I have found that there has been no foreign exchange with respect to the chervonetz in the true sense. There has been no market in which transactions have been had between willing buyers and willing sellers so that the value of the chervonetz might be determined from the price fixed in that market. In the absence of any such market, rules for determining the value of foreign currency based on the existence of such a market may not be applied to the chervonetz. Some other method of determining value must be found. The chervonetz unquestionably had a value in 1932, but that value was not the official value and there was no true market value. In my opinion the value of a currency under circumstances such as these may be determined only by a consideration of all of the surrounding circumstances, and, therefore, a very wide latitude must be permitted in the presentation of evidence which bears upon the question. It seems to me that the testimony with respect to both types of bootleg transaction falls within the type of testimony which should be considered.

For a similar reason, I now rule that the testimony with respect to the values which could be obtained at the Torgsin stores and the official government hotels and the explanation of those values by newspaper correspondents, economists and sociologists, was all relevant and admissible testimony. Much of this testimony went far afield; but the question is one of great complexity and all of this testimony had some materiality on the question of value.

I have considered the admissibility of the other testimony as to which I reserved my rulings. I overrule all of the objections to the admissibility of testimony, except as expressly stated to the contrary in this opinion.

I direct judgment that the complaint in each of these actions be dismissed on the merits.

The attorneys are requested to submit findings.