**Ngoc Quang TRINH, Plaintiff–Appellee,**

v.

**CITIBANK, N.A., Defendant-Appellant.**

**No. 86–1258.**

United States Court of Appeals,
Sixth Circuit.

Argued March 27, 1987.

Decided July 8, 1988.

Rehearing and Rehearing En Banc
Denied Sept. 21, 1988.

John E. Jacobs (Lead Counsel), Mason, Steinhart & Jacobs, P.C., Southfield, Mich., John E. Hoffman, Jr., argued, Shearman & Sterling, New York City, for defendant-appellant.

Lawrence John, argued, Detroit, Mich., for plaintiff-appellee.

Anthony J. Steinmeyer (Lead), Marc Richman, Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., James M. Spears, argued, for amicus curiae, U.S.

Before KEITH and JONES, Circuit Judges, and BROWN, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Defendant-appellant Citibank, N.A. ("Citibank") appeals from a judgment holding it liable to plaintiff-appellee Ngoc Quang Trinh ("Trinh") for payment on Trinh's savings account in Citibank's former branch bank in Saigon, South Vietnam. The district court, relying primarily on *Vishipco Line v. Chase Manhattan Bank*, 660 F.2d 854 (2d Cir.1981), *cert. denied*, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982), concluded that the home office of the Saigon branch of Citibank was liable on deposits placed in the foreign branch when the branch was forced to close in 1975 as a result of the impending overthrow of Saigon by revolutionary forces. *Trinh v. Citibank*, 623 F.Supp. 1526 (E.D.Mich.1985). In effect, the lower court placed the risk of loss arising from a political revolution on the domestic home office of the American bank rather than on the individual depositors. Because we agree that this is precisely where the risk of loss belongs—and because neither the deposit agreement construed in light of the Vietnamese law of *force majeure* nor the affirmative defense asserted by Citibank convinces us otherwise—we affirm the judgment of the district court.

## I.

Citibank is an international banking corporation based in New York with branch offices all over the world. Prior to 1975, it operated a branch in Saigon, South Vietnam known as Citibank Saigon. Under Vietnamese law, Citibank could not have operated in Vietnam through a separate corporation or subsidiary; Citibank was limited to operating as a branch. Moreover, Vietnamese law required that a branch maintain all of its assets in the local currency and keep all the branch's capital, assets, funds, books and records separate and apart from those of the home office. Vietnamese law also required that branch banks have a paid-in capital reserve equal to a certain percentage of its customer's deposits and that this capital be earmarked and transferred to the branch *by the home office*.[1]

---

1. Article 26 of Decree Law 18 provides as follows:

 The Vietnam branch of a foreign bank— ... the head office [of the foreign bank] must clearly earmark and transfer to the branch in Vietnam a capital commensurate with the conditions stipulated in articles 12 & 13 of this Decree Law.

 J. App. at 136 (brackets in original). Articles 12 and 13 state in pertinent part:

 *Article 12.* Each bank in Vietnam shall have a fully paid-in capital the minimum amount of which shall be determined for each type of bank by the Administrative Council of the National Bank....

On July 25, 1974, plaintiff's father, Quang Quy Trinh, a retired senator in the South Vietnamese government, opened a joint savings account at Citibank Saigon in his name and that of his son. The account paid annual interest at a rate of 19% compounded daily. At the time Trinh's father opened the account, Trinh was a student residing in Michigan. He became a United States citizen in 1979 and has never returned to Vietnam.

The deposit agreement governing the account provided that "withdrawals [would] be permitted only at Citibank's place of business"—which was designated as "28–30 Nguyen Van Thinh, Saigon 1, Republic of Vietnam"—and that deposits were payable only in Vietnamese piasters. The agreement further provided as follows:

> Citibank does not accept responsibility for any loss or damage suffered or incurred by any depositor resulting from government orders, laws ... or from any other cause beyond its control.

J. App. at 126.

In early April 1975, the situation in Saigon was becoming desperate as the North Vietnamese forces closed in on the city. During this period, American embassy officials met often with the branch officers of the American banks in Saigon to consider what actions should be taken to protect the safety of employees, both American and Vietnamese. These meetings produced a contingency plan for emergency evacuation. During this time, the branch bank encouraged concerned depositors to withdraw their money, although the situation did not safely allow for the posting of formal notices suggesting such withdrawals.

On April 24, 1975, on the eve of Saigon's fall to the North Vietnamese, Citibank closed its Saigon branch, and its personnel left the city in conjunction with the general evacuation of American citizens and Vietnamese employees planned by the United States Embassy. All of the branch's documents, files, records, and books were left in the branch. Cash from the branch, as well as the branch's keys, vault combination, and official documents, were entrusted to embassy officials with a request to turn them over to the National Bank of Vietnam, South Vietnam's central banking authority.

The following day, on April 25, 1975, the South Vietnamese government issued a joint communique stating that Citibank, and two other American banks, had "closed temporarily without asking for permission"; that these banks would be sanctioned; and that the National Bank and the Finance Ministry guaranteed to return all the money legally deposited.

Less than one week later, on April 30, 1975, the South Vietnamese government in Saigon fell. On May 1, 1975, the new revolutionary administration of Vietnam declared victory and confiscated all banks. Thus, all Saigon banks, including Citibank's branch, were "placed under the management of the Saigon–Gio Dinh Military Management Committee banking committee," and their operations suspended. The National Bank of Vietnam, the central bank, reopened under North Vietnamese control, and over the course of several weeks made a number of announcements concerning its plans for the future. Specifically, the central bank announced:

> The Vietnam National Bank ... is ready to recover former debts incurred by banks through lending and to conduct settlement of debts, deposits, savings and all other sources of capital in the economy.

J. App. at 152. It was further announced that:

> [T]he national bank guarantees that the savings accounts of workers, who legitimately earn their income through their own efforts and labor, will gradually be paid to them....
>
> ....
>
> As regards banks whose owners have fled the country, the national bank will inventory and re-evaluate their assets

*Article 13...* 1) The total of the capital already paid-in, the reserve amount and the undistributed profits of each bank shall always be maintained at a minimum percentage of the amount of deposits of its customers.... J. App. at 134.

and settle their accounts in order to determine their ability to return the savings of account holders....

*Id.* at 156–57.

Shortly after the fall of Saigon, plaintiff's father was placed in a reeducation camp. After his release in 1980, he sent the Citibank Saigon passbook to his son in Michigan. In May 1980, Trinh called the International Division of Citibank in New York to inquire about the deposit. Trinh was told that the National Bank of Vietnam was now responsible for the deposit. On November 5, 1980, Trinh wrote to Walter Wriston, Chairman of Citibank, expressing dissatisfaction with this reply, and was again told that the National Bank was responsible for the deposit. This lawsuit was commenced in the Eastern District of Michigan on June 14, 1984.

Applying Vietnamese law, the district court found in favor of Trinh. *Trinh v. Citibank*, 623 F. Supp. 1526 (E.D.Mich. 1985). As mentioned, the court relied primarily on Judge Mansfield's opinion in *Vishipco*, where on similar facts, the Second Circuit found the Chase Manhattan Bank liable to depositors in its former Saigon branch. In this respect, the court concluded that the deposit agreement with Trinh formed an underlying basis for recovery against the bank and that, as in *Vishipco*, the Vietnamese law of *force majeure* did not relieve Citibank of its liability on that deposit. 623 F. Supp. at 1532. Although the court recognized that in *Vishipco* the underlying obligation had been construed under New York law, as opposed to Vietnamese law, the court did not find this distinction to be significant. *Id.* In the first place, the court noted that Citibank never argued that, under Vietnamese law, Trinh's deposits did not equal a debt of the bank or form an underlying basis for recovery. Moreover, since the *Vishipco* court *did* apply Vietnamese law to the argument that *force majeure* relieved the bank of liability—the same argument that

Citibank makes here—the fact that it addressed this argument as an affirmative defense to liability (rather than as a threshold basis for denying recovery on the underlying obligation) was not, the court believed, the basis for a meaningful distinction. *Id.*

The court then stated that, even if it accepted Citibank's proposition that the doctrine of *force majeure* was incorporated into the bank's underlying obligation on the deposits, the application of that doctrine to these facts would nevertheless not relieve Citibank of liability. *Id.* at 1533. Specifically, the court reasoned that Citibank's decision to close its Saigon branch was a matter of "voluntary choice," not an act of God, act of government, or "fortuitous cause beyond its control," as required by Vietnamese law. *Id.* at 1533–34.

Further, the court rejected Citibank's argument that Citibank Saigon had been nationalized by the revolutionary government and that the National Bank of Vietnam was its successor in interest. *Id.* at 1534. The court concluded that the argument failed for two reasons. First, the court found that the situs of the deposit was no longer Vietnam at the time the expropriation took place because it had "spr[ung] back" to the head office of Citibank when Citibank Saigon was voluntarily closed. *Id.* at 1536. Second, the court found that Citibank had failed to prove that the Vietnamese government had clearly assumed the liabilities as well as the assets of Citibank Saigon. *Id.* at 1534–35. Accordingly, the district court ordered Citibank to pay Trinh the dollar value of his account, $1403.67, plus prejudgment interest of $1792.69, for a total of $3196.36.

## II.

### A.

█ Citibank's primary argument on appeal is that the deposit agreement construed under Vietnamese law [2] places the

---

**2.** We agree with the district court that the law of Vietnam applies to this case. Generally, as the lower court explained, a court must apply the law of the forum with the most significant con-

tacts with the case, the law where the contract was made, or the law where the branch was located. *See, e.g., Zimmermann v. Sutherland,* 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034 (1927);

risk of loss for a political revolution on the depositor not on the domestic home office. In this respect, the bank points to the express terms of the agreement, signed by Trinh's father, which provides both that "Citibank does not accept responsibility for any loss or damage suffered or incurred by any depositor resulting from government orders, laws ... or from any other cause beyond its control," and that payment on accounts would be made only in Vietnam and only in piasters. In the bank's view, these provisions of the agreement create an implicit distinction between *credit* risk and *sovereign* risk, with the bank bearing only the former. Thus, where a branch is unable to pay its depositors as a result of, for instance, financial mismanagement, robbery, or insolvency—the typical kinds of economic or credit risks normally assumed by companies doing business internationally—Citibank concedes that the home office would be liable for the deposits because, in such circumstances, payment could nevertheless be made in Vietnam and in piasters. However, where, as here, revolutionary conditions make payment in Vietnam in piasters impossible, Citibank believes that, under the deposit agreement, the depositor, not the domestic home office, must bear the loss.

The bank argues that its intention to create an implicit distinction between credit risk and sovereign risk is suggested, not only by the plain terms of the agreement, but also by a construction of those terms in light of applicable Vietnamese commercial law. More specifically, the bank argues that it should be presumed that the parties intended for their agreement to be consistent with the Vietnamese law of *force majeure*,[3] which, according to the testimony of the bank's Vietnamese law expert, placed

the risk of loss on the depositor in the unique circumstances presented here.

For these reasons, Citibank contends that the only reasonable expectation of depositors was to receive piasters at Citibank Saigon. In the bank's view, by allowing the plaintiff to recover, the district court effectively re-wrote key provisions of the deposit agreement and, further, gave the depositor something he could not have gotten—and could not have expected to get—under that agreement construed in light of Vietnamese law: United States dollars in the United States at a rate of interest (19%) which would have been illegal for Citibank to pay under U.S. law.

■ We are not persuaded by the bank's arguments. In the first place, as the district court correctly recognized, it is a general banking principle that the home office is *ultimately liable* on a deposit placed in its foreign branch if, as here, the branch closes or otherwise wrongfully refuses to return a deposit. *Sokoloff v. National City Bank*, 130 Misc. 66, 73, 224 N.Y.S. 102, 114 (N.Y. Sup.Ct.1927); *see also Bluebird Undergarment Corp. v. Gomez*, 139 Misc. 742, 249 N.Y.S. 319 (City Ct. N.Y. 1931); Heininger, *Liability of U.S. Banks for Deposits Placed in Their Foreign Branches*, 11 Law & Pol.Int'l Bus. 903, 926 (1979). This well-established general principle of ultimate liability is not inconsistent with Citibank's assertion that a branch bank is a separate and distinct business entity. *See* Brief of Citibank at 30–32. To this end, the bank is surely correct in arguing that absent special circumstances, deposits made in branch banks are payable only there. *Id.* (citing *Bluebird Undergarment Corp. v. Gomez*, 139 Misc. 742, 249 N.Y.S. 319 (City Ct. N.Y. 1931)). However, as we read *Sokoloff*, *Bluebird* and similar cases, one of the "special circumstances"

*Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank*, 731 F.2d 112 (2d Cir.1984). Here, all of the indicators point to a conclusion that Vietnamese law applies. Plaintiff's citizenship was Vietnamese, and his father, Citibank Saigon, the banking relationship, the banking transactions, and the account currency were all located in Vietnam.

**3.** Article 701 of the Vietnamese Commercial Code (V.C.C.) provided: "The debtor does not

have to pay damages if his violation or non-performance of contractual obligations is due to a fortuitous cause or case of *force majeure*."

Article 1206 of the V.C.C. provided: "The depositary is not liable for accidents or risks resulting from *force majeure*, unless previously he had been given notice to return the deposited objects."

triggering liability against the home office *is* the *closing of a branch. Bluebird,* 249 N.Y.S. at 321–22. Thus, while it is true that the payment obligation exists *primarily* between the branch bank and the depositor, the *ultimate* obligation on the deposits remains with the home office. *Id.; Vishipco,* 660 F.2d at 863; *see also* Annotation, *Branch Banks,* 136 A.L.R. 471, 493–97 (1942).

That the home office of the branch was to be ultimately liable for the deposits of its foreign customers is further suggested, we think, by the Vietnamese laws under which foreign banks operated. These laws permitted foreign banks to operate only through branches, and required the home office of a branch to "clearly earmark *and transfer to the branch* in Vietnam" an amount of capital equal to a certain percentage of the branch's deposits. *See supra* at note 1. The home office was required to maintain this paid-in reserve amount at its proper level, and so as deposits increased, transfers to the branch would increase as well. In our view, by prohibiting foreign banks from operating through locally incorporated subsidiaries, and by requiring parent banks to maintain paid-in capital reserves at their Vietnamese branches, Vietnamese law sought to remove any ambiguity as to where the responsibility would ultimately lie for the liabilities of branch banks. In this respect, South Vietnam furthered its national policy, as recognized by the court in *Vishipco,* of enabling "those depositing in foreign branches to gain more protection than they would have received had their money been deposited in locally incorporated subsidiaries of foreign banks." *Vishipco,* 660 F.2d at 863.

While not denying that in some circumstances the home office would be ultimately liable for deposits placed in its foreign branch, Citibank argues that in this case the deposit agreement construed under Vietnamese law limits the home office's ulti-

mate liability to only those situations in which the branch's failure to pay is the result of *credit,* as opposed to sovereign, risks. More specifically, as outlined above, Citibank concedes that the home office would be liable under the deposit agreement if the branch's failure to pay was the result of insolvency, financial mismanagement, or any other circumstance in which payment could still be made in Vietnam and in piasters. The bank maintains, however, that it is not liable under the agreement where, as here, political events have made payment in Vietnam in piasters impossible. We are not persuaded that such a distinction is evident here or that one is required by application of the Vietnamese law of *force majeure.*

By operating a branch office in Vietnam, Citibank indicated to its foreign depositors that it accepted the risk that, in at least some circumstances, it would be liable elsewhere for obligations incurred by its branch. *Vishipco,* 660 F.2d at 863. In so doing, it "reassure[d] [those] depositors that their deposits [would] be safer with them than they would be in a locally incorporated bank." *Id.* (citing Heininger, *supra,* at 911–12). With the volatile situation in Vietnam in the early 1970's, this assurance of safety was undoubtedly one of the primary factors motivating Vietnamese depositors, like Trinh, to place their money in Citibank.[4] Certainly, these depositors expected that Citibank, with its worldwide assets and international reputation, would be "good" for the deposits if, for *whatever reason*—whether it be financial mismanagement, insolvency, or political events— Citibank Saigon could not return them. In our view, the deposit agreement did not dispel these expectations. That is, while we recognize that the deposit agreement absolved the *branch office* of responsibility for losses resulting from government orders and "any other cause beyond its control," we do not find in that agreement *any* indication that the depositor could not pro-

---

**4.** That Trinh relied on this safety factor is evidenced by an English translation of the agreement he signed when the account was originally opened on July 25, 1974. The agreement contains a section where the depositor is asked to indicate, by checking the relevant box, his reason for opening an account with Citibank. Trinh's reason for banking at Citibank was: "My money is safer with Citibank." *See* J. App. at 130–31.

ceed against the home office if the branch has failed to pay.

Consistent with this, we reject Citibank's argument that the provision of the agreement limiting payment on deposits to Vietnam and to Vietnamese piasters was sufficient to inform depositors that they were to bear the risk of loss, and would have no recourse against the home office, if Citibank Saigon was forced to close due to revolutionary conditions. As we have emphasized, such an allocation of risk is contrary to the depositor's expectations that the bank, by operating through a branch, has consented to be liable elsewhere for the branch's obligation in the event the branch does not meet them. Banks certainly can, and will, seek to limit by contract the extent of their exposure to such liability; however, to be effective, such limitation provisions must be explicit and must clearly and unmistakably inform depositors that they have no right to proceed against the home office. The provision here, specifying the place where the branch will make payment and the currency it will use, is insufficient under this standard. In our view, a person who had signed a deposit agreement containing such a provision would not have been aware that he had given up his right to proceed against the home office in the event the branch was no longer in existence and could not pay its depositors.

We do not believe that the Vietnamese law of *force majeure,* applied to the deposit agreement, requires us to reach a contrary conclusion. *Force majeure* is a French term used to describe acts of God, acts of government, and any other fortuitous cause beyond the control of the parties in the contract. The doctrine was codified in section 1206 of the Vietnamese Commercial Code, which provided that the "depositary is not liable for accidents or risks resulting from *force majeure,* unless previously he has been given notice to return the deposited object." *See supra* note 3. Citibank's expert on Vietnamese law, Mr. Ta Van Tai, testified that in his opinion the takeover of the bank and the abolition of the piaster by the Vietcong was an act of government beyond the control of the

bank. In his view, since Trinh did not previously request return of his deposits, Trinh must suffer the loss.

While we do not deny that the closing of a bank by revolutionary forces is the type of fortuitous cause contemplated by the law of *force majeure,* we do not agree that, where a parent/branch relationship is involved, application of that doctrine requires the conclusion that the depositor is to bear the risk of loss. As recognized by both the lower court here and the Second Circuit in *Vishipco,* impossibility of performance in Vietnam did not relieve Citibank of its obligation to perform elsewhere. *Vishipco,* 660 F.2d at 863–64. Citibank had accepted the risk of such an obligation by operating a branch in Vietnam. Since its Vietnamese depositors did not waive their right to proceed against the home office, Citibank cannot be heard to argue that the inability of its Saigon branch to perform relieves the home office of liability for the bank's debts incurred in Saigon. In our view, Citibank, as an ongoing business entity, was able in April 1975, and remains able to this day, to discharge those debts either in New York or at a variety of other points outside of Vietnam.

For the above reasons, we are in agreement with the lower court that the deposit agreement construed under Vietnamese law does not foreclose Trinh from proceeding against Citibank's New York office to recover on the deposits made at Citibank's branch in Saigon. Accordingly, unless it is relieved of liability by some affirmative defense, Citibank is liable to Trinh for the amount deposited.

#### B.

 Citibank argues, as a defense to liability, that the National Bank of Vietnam expressly assumed Citibank Saigon's assets *and* liabilities, thereby becoming liable on Trinh's account as Citibank Saigon's successor in interest. Citibank argues that this assumption of Citibank Saigon's obligations was undertaken as early as April 25, 1975, when the National Bank of Vietnam, still operating under South Vietnam-

ese rule, guaranteed to return all money legally deposited in the recently-evacuated U.S. branch banks. Citibank further argues that when the Vietcong overran Saigon less than a week later, the new government confirmed, rather than denied, this assumption of assets and liabilities. As evidence of this, Citibank points to a number of published declarations of the new government, including, most specifically, its declaration that "[a]ll ... banks ... will be confiscated and, from now on, managed by the revolutionary administration," J.App. at 148, and its declaration that the newly-reorganized National Bank of Vietnam was "ready to recover former debts incurred by banks through lending and to conduct settlement of debts, deposits, savings and all other sources of capital in the economy." *Id.* at 152. According to Citibank, the confiscation of the banks and the assumption of assets and liabilities were the acts of a sovereign state which, under the act of state doctrine, must be given their intended effect by United States courts.

We agree with the district court that this defense does not relieve Citibank of its obligation on the deposits. As an initial matter, we believe Judge Gilmore was correct in holding that the April 25, 1975 announcement of the South Vietnamese government was not binding on the new regime and was irrelevant to the issue of whether the liabilities of Citibank Saigon had been assumed by the National Bank of Vietnam. In so holding, we are not unmindful that, under basic principles of state succession, a promise of a former state is generally binding on the successor state. *See, e.g., Vilas v. City of Manila,* 220 U.S. 345, 357, 31 S.Ct. 416, 419, 55 L.Ed. 491 (1911) (quoting *Chicago Rock Island & Pacific Ry. Co. v. McGlinn,* 114 U.S. 542, 546, 5 S.Ct. 1005, 1006, 29 L.Ed. 270 (1885)). However, in these circumstances, where revolutionary forces were closing in on Saigon and the South Vietnamese government was squarely faced with its own imminent demise—a demise which became a reality only days later—we do not believe that a statement by the South Vietnamese government purporting to accept responsi-

bility for the obligations of the evacuated U.S. branch banks is effective to bind the new regime with regard to those obligations.

Further, and more directly to the point, we are not at all persuaded that, by confiscating the nation's banks, the new government undertook to assume the *liabilities* of foreign banks, like Citibank Saigon, that fled the country in the face of the fall of South Vietnam. As the district court accurately observed, and as evidenced by various statements of the new regime quoted in the court's opinion (623 F. Supp. at 1535), Citibank's proof with regard to the assumption of liabilities of foreign banks was "equivocal at best." For example, in June of 1975, the National Bank issued a communique stating, among other things, that "*all* foreign banks must accept responsibility" for the liquidation of deposits. J.App. at 152. And, a September 7, 1975 newspaper announcement provided as follows:

> As regards banks whose owners have fled the country, the national bank will inventory and re-evaluate *their* assets and settle *their* accounts in order to determine *their ability* to return the savings of account holders; the bank will issue a notice concerning these persons.

*Id.* at 157 (emphasis added). These announcements, and others of similar tone, do *not* as the district court held, "indicate an unqualified assumption of all liabilities" by the new government. Indeed, in our view, the announcements suggest that the new government specifically did *not* intend to assume the liabilities of foreign banks whose "owners fled the country," but instead expected such liability to remain with those banks.

More importantly, the confiscation decree and other decrees of the new government regarding bank deposits would not, in any event, have had any effect on Citibank's debt to Trinh because, as recognized in *Vishipco* and in the court below, the deposits in Citibank Saigon no longer had their "situs" in Vietnam at the time of the decrees.

Generally speaking, an act of state will go unquestioned in United States courts

only to the extent that it affects property whose "situs" is within the territorial jurisdiction of the acting state. While this is a relatively simple concept to apply with respect to tangible property, it becomes more difficult with respect to intangible property such as the debts of a bank. As one court has observed: "The situs of intangible property is about as intangible a concept as is known to the law." *Tabacalera Severiano Jorge v. Standard Cigar Co.*, 392 F.2d 706, 714 (5th Cir.), *cert. denied*, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968). We think the court in *Vishipco* had it right in concluding that, for purposes of the act of state doctrine, a debt does *not* have its "situs" in the foreign state unless the state has the power to enforce or collect it; a power which, the court explained, is dependent upon jurisdiction over the *debtor*. *Vishipco*, 660 F.2d at 862 (citing *Harris v. Balk*, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905)). Since in this case, as in *Vishipco*, the debtor (Citibank) abandoned its Saigon branch at the time of the Vietnamese decrees and no longer had any presence in Vietnam which would remain in existence after its departure, the revolutionary government had no jurisdiction over the debtor. Accordingly, the "situs" of the debts was not in Vietnam and the Vietnamese decrees could have no effect on Citibank's debt to Trinh. *See also* Heininger, *Liability of U.S. Banks*, 11 Law & Pol. Int'l Bus. at 975.[5]

For the above-stated reasons, Citibank's defense to liability fails and, accordingly, it is liable to Trinh on the deposit account.

## C.

As a final observation, we believe that the result reached by this opinion is fair and equitable under the circumstances. We are, of course, not unmindful of the fact that both Trinh and Citibank are innocent parties and, to a great extent, victims of circumstances beyond their control. However, as with many disputes involving innocent parties, it is our job as a court to determine which of those parties is to suffer the loss. Here, because we are not persuaded that either the deposit agreement or the Vietnamese law of *force majeure* requires a contrary conclusion, we conclude that the loss is to be borne by the bank.

To this end, we think Judge Mansfield was absolutely right in *Vishipco*, where he observed:

> A bank which accepts deposits at a foreign branch becomes a debtor, not a bailee, with respect to its depositors. In the event that unsettled local conditions require it to cease operations, it should inform its depositors of the date when its branch will close and give them the opportunity to withdraw their deposits or, if conditions prevent such steps, enable them to obtain payment at an alternative location. In the rare event that such measures are either impossible or only partially successful, fairness dictates that the parent bank be liable for those deposits which it was unable to return abroad. To hold otherwise would be to undermine the seriousness of its obligations to its depositors and under some circumstances (not necessarily present here) to gain a windfall.

*Vishipco*, 660 F.2d at 864 (citations omitted).

## III.

For all of the foregoing reasons, Citibank is liable to Trinh on the deposits made by his father in the Saigon branch of Citibank. The judgment of the district court is AFFIRMED.

5. As Professor Heininger observed:

The situs of a bank's debt on a deposit is considered to be at the branch where the deposit is carried, but if the branch is closed ... the depositor has a claim against the home office; thus, the situs of the debt represented by the deposit would spring back and cling to the home office. If the situs of the debt ceased to be within the territorial jurisdiction of [the confiscating state] from the time the branch was closed, then at the time the confiscatory decree was promulgated, [the confiscating state would] no longer [have] sufficient jurisdiction over it to affect it.... [U]nder the act of state doctrine, the courts of the United States are not bound to give effect to foreign acts of state as to property outside the acting state's territorial jurisdiction.

BAILEY BROWN, Senior Circuit Judge, dissenting.

The majority opinion, as does the opinion of the district court, demonstrates a great deal of heart but will not stand careful legal analysis. For this reason, I respectfully dissent.

As was recognized by the district court, although Trinh, the plaintiff, alleged only diversity jurisdiction (28 U.S.C. § 1332), the court also had federal question jurisdiction because Citibank is a national bank (12 U.S.C. § 632). The district court then, in making its choice of law determination, wrestled with the question whether Michigan or federal common law conflict of laws should be applied and came to the conclusion that, irrespective of which it applied, Vietnam law governed. *Trinh v. Citibank, N.A.,* 623 F.Supp. 1526, 1531 (E.D.Mich. 1985). The parties, on appeal, agree with this determination.

Citibank advanced several theories of defense. The first was that, under the very terms of the contract between the depositor and Citibank at the time the deposits were made, and particularly in the light of the commercial law of Vietnam as to the effect of *force majeure,* Citibank was not liable to Trinh. The second defense was that the failure of Citibank to pay resulted from sovereign risk or *force majeure* rather than credit risk and that, under Vietnam law, sovereign risk was assigned to the depositor. Another defense was that the National Bank of Vietnam claimed the assets and assumed the liabilities of Citibank after Citibank's employees fled the country and before the communists took over. Still another defense was that Citibank was not liable to Trinh because the revolutionary communist government expropriated Citi-

bank's Saigon branch, including the assets. Without intending to deprecate Citibank's other defenses, I believe that its first defense, based upon the terms of the deposit contract, is a valid one and requires a reversal of the district court's judgment in favor of Trinh.[1]

The pertinent facts are undisputed. Citibank (formerly First National City Bank) is an international banking corporation based in New York which for many years prior to May 1975 operated a branch bank in Saigon, South Vietnam. In order to operate that branch, Citibank had to abide by Vietnamese banking laws, which, *inter alia,* required Citibank to establish a branch rather than a distinct corporate subsidiary, to maintain all the branch's assets in the local currency (piasters), and to keep all the branch's capital, assets, funds, books, and records separate and apart from those of the American home office.

In 1974, Trinh's father, a senator in the South Vietnamese government, opened a joint savings account at Citibank's Saigon branch in his name and that of his son.[2] The account paid an interest rate of 19 percent, compounded daily. The deposit agreement governing the account expressly provided, as required by Vietnamese banking law, that the account was payable solely at the Saigon branch office[3] and solely in piasters. The deposit agreement also provided explicitly that Citibank's Saigon branch "does not accept responsibility for any loss or damage suffered or incurred by any depositor resulting from government orders, laws, levies, taxes, embargoes, moratoriums, exchange restrictions or from any other cause beyond its control."

1. Although the district court's opinion states (623 F.Supp. at 1532) that "Citibank, in the present case, has never argued that, under the law of Vietnam, Trinh's deposits do not equal a debt of the bank or form an underlying basis of recovery," it is clear that Citibank did indeed take this position. "Statement of Defendant's Claims and Defenses" in Final Pre-Trial Order, App. at 9. Moreover, the majority opinion properly recognizes that Citibank made this defense and addresses it.

2. At the time, Trinh was a student residing in Michigan. He never returned to Vietnam and became a United States citizen in 1979.

3. The deposit agreement provided that "[w]ithdrawals from an account will be permitted only at Citibank's *place of business.*" (emphasis added). The deposit agreement specifically designated Citibank's "place of business" as "28–30 Nguyen Van Thinh, Saigon 1, Republic of Vietnam."

In early April 1975, as North Vietnam's military forces approached Saigon, American embassy officials met with the branch bank's officers to consider the future safety of the branch bank's employees, both Vietnamese and American. The meetings produced a contingency plan for an emergency evacuation. During this time, the branch bank encouraged concerned depositors to withdraw their money, but the situation precluded, as the majority opinion recognizes, posting formal notices suggesting such withdrawals.

On April 24, 1975, on the eve of North Vietnam's takeover of Saigon, Citibank closed its Saigon branch and evacuated the branch's personnel in conjunction with the general evacuation coordinated by the American embassy. All of the branch's documents, files, records, and books were left in the building. The branch's keys, vault combination, and official documents list were entrusted to the Embassy's economics attache with a request that he turn them over to the National Bank of Vietnam, South Vietnam's central banking authority. There is no contention that Citibank removed any assets of its Saigon branch.[4]

The next day, on April 25, 1975, the South Vietnamese Finance Ministry and the National Bank of Vietnam issued a joint communique announcing:

> [T]he Chase Manhattan Bank, the First National City Bank [Citibank] and the Bank of America [have] closed temporarily without asking for permission from our government.... The National Bank would like to remind those who have accounts in these banks that the National Bank guarantees to return all the money legally deposited. Reimbursement procedures will be made public in a future communique of the National Bank.

No such "future communique" was ever issued, because several days later North Vietnam's forces overran Saigon and established a new, communist government. On May 1, 1975, the new government declared that "[a]ll ... banks ... will be confiscated and, from now on, managed by the revolutionary administration." Eight days thereafter, on May 9, 1975, the new government announced that "[t]he activities of all banks are temporarily suspended until further notice. All banks must be placed under the management of the Saigon–Gia Dinh Military Management Committee banking committee." The National Bank of Vietnam then reopened under communist rule and stated its readiness "to recover former debts incurred by banks through lending and to conduct settlement of debts, deposits, savings and all other sources of capital in the economy." Towards that end, over the next several months the National Bank of Vietnam published, *inter alia*, the following policies:

> With regard to previous deposits, securities and savings, all debtor banks, including all foreign banks, must accept responsibility for their liquidation and the submission of their records to the Vietnam National Bank. After settlement with banks, the Vietnam National Bank will conduct reviews and make known authorization to use deposits in accordance with production and commercial requirements and will pay out savings to workers and people according to new banking regulations.

> [T]he national bank guarantees that the savings accounts of workers, who legitimately earn their income through their own efforts and labor, will gradually be paid to them.

> As regards persons wanting to withdraw money on deposit at a bank ... while awaiting the settlement of accounts with the private banks, the National Bank of Vietnam will study and satisfactorily meet loan requests for reasonable business and production needs.

---

**4.** The Citibank branch manager's testimony describing the confusion and fear leading to the escape from South Vietnam of the branch's personnel, including its Vietnamese employees, is a harrowing story. It was necessary for the manager to portray the Vietnamese employees as his personal dependents in order to get them out of the country. These employees surmised that bankers would not be favorably treated by the incoming revolutionary government.

As regards banks whose owners have fled the country, the national bank will inventory and re-evaluate their assets and settle their accounts in order to determine their ability to return the savings of account holders[.]

As for the comprador bourgeoisie who undertook speculation in wartime by relying on the U.S. Imperialists and colluding with the ringleaders in the puppet armed forces and administration and who fled abroad or still remain in the country, their entire property under state management will be confiscated completely or partly according to the gravity of their crimes.

Shortly after the communist takeover of Saigon, Trinh's father was placed in a "re-education" camp. Five years later, in early 1980, Trinh's father was released, whereupon he notified Trinh of the joint savings account in Citibank's former Saigon branch. Trinh then sought payment on that account at Citibank's office in New York. Citibank refused to pay on the ground that, in its view, the National Bank of Vietnam is now responsible for the account. In response, Trinh brought this suit.

During the bench trial, Trinh's evidence consisted primarily of his own testimony and that of a foreign currency expert. Trinh presented no expert testimony concerning Vietnamese law. Citibank's evidence included the testimony of the customer service representative who opened Trinh's account, the manager who helped evacuate Citibank personnel, a foreign currency expert, and an expert on Vietnamese law.

Applying Vietnamese law, the district court held in favor of Trinh. *Trinh v. Citibank, N.A.*, 623 F.Supp. 1526 (E.D. Mich. 1985). In so doing, the district court relied heavily on *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854 (2d Cir.1981), *cert. denied*, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982), a factually analogous case wherein the Second Circuit held Chase Manhattan's home office in New York liable to depositors at its former Saigon branch. Tracking the *Vishipco* court's line of reasoning, the district court first maintained (incorrectly, as heretofore stated in note 1) that Citibank never contended that under Vietnamese law the deposit agreement does not form a basis for recovery; the district court then went on to reject Citibank's three affirmative defenses: *force majeure* as set out in Vietnam's commercial law, assumption of Citibank's liabilities by the National Bank of Vietnam, and confiscation of Trinh's deposit by the communist government. Accordingly, the district court ordered Citibank to pay Trinh the dollar value of his account, with 19% interest.

I believe the district court misperceived Citibank's position and as a result failed to recognize a critical distinction between this case and *Vishipco*. In *Vishipco*, "neither party invoked foreign law with respect to Chase's basic obligations to its depositors and holders of certificates of deposit. Nor did Chase ever suggest that under Vietnamese law those obligations would not have formed a basis for recovery." 660 F.2d at 860. Therefore, the *Vishipco* court cursorily construed the deposit contract under *New York law* and held that the contract rendered Chase liable to its Saigon branch depositors unless Chase could prove an affirmative defense making the contract unenforceable. Here, on the other hand, Citibank does indeed invoke Vietnamese law regarding its basic contractual obligations to its Saigon branch depositors and vigorously maintains that under Vietnamese law the deposit agreement between it and Trinh does not provide a basis for recovery, quite apart from the validity of its affirmative defenses. In other words, here Citibank argues that, as a threshold matter, the deposit agreement itself precludes recovery, whereas in *Vishipco* Chase apparently conceded that the deposit agreement created liability in the absence of some valid affirmative defense. Consequently, *Vishipco* is inapposite concerning the initial question of the scope of Citibank's contractual obligations to Trinh un-

der Vietnamese law.[5] It is to that question, which is one of first impression, that attention must now be directed.

Citibank concedes that under the deposit agreement its domestic home office must rectify the Saigon branch's failure to pay on Trinh's account if such failure results from financial mismanagement, insolvency, robbery, natural catastrophe, or virtually any other circumstance in which the rectification could still entail payment in Vietnam in piasters. Citibank maintains, however, that under the deposit agreement its domestic home office need not rectify the Saigon branch's failure to pay on Trinh's account if such failure results from political events making payment in Vietnam in piasters impossible. (The piaster ceased to exist shortly after the communist government was installed.) In other words, Citibank contends that the deposit agreement implicitly distinguishes between credit risk and sovereign risk, with Citibank bearing the former and Trinh bearing the latter. In Citibank's view, that crucial distinction arises from certain provisions of the deposit agreement construed in light of the Vietnamese and American legal framework in which Citibank's Saigon branch operated.

More precisely, Citibank points to the provisions of the deposit agreement limiting payment on the account to Vietnam and to Vietnamese currency and relieving Citibank's Saigon branch of liability "for any loss or damage suffered or incurred by any depositor resulting from government orders, laws ... or from any other cause beyond its control." According to Citibank, those clear and simple provisions, construed together, evince the parties' intent to terminate Citibank's responsibility to pay on a deposit where, as here, a governmental revolution precludes payment in Vietnam in piasters.

Moreover, in Citibank's view, such an intent appears from not just the deposit agreement's plain language, but also the background of Vietnamese commercial law. That law incorporates the doctrine of *force majeure*,[6] which, according to uncontradicted expert testimony, requires that losses lie where they fall under the extraordinary circumstances present here. According to Citibank, in the absence of clear contractual language to the contrary, it should be assumed that the parties meant the deposit agreement to be consistent with Vietnam's codification of *force majeure*.

Citibank also maintains that the parties' intent may be inferred in part from American regulations governing foreign branch banking. Citibank notes that the Federal Reserve Board, the federal agency with authority over international banking operations of United States banks, has long encouraged foreign branches to operate, to a significant extent, as separate entities from their domestic home offices, and has permitted foreign branches to offer unusually attractive interest rates in exchange for the depositors' acceptance of the risk of political upheaval. For example, during 1974 and 1975, deposits payable only at an office outside the United States were exempt from reserve requirements and from the then prevailing 5% cap on savings deposit interest rates. *See* 12 C.F.R. §§ 204.-2(t), 217.0(c) and 217.7(c) (1974 and 1975). Thus, Trinh's account at Citibank's Saigon branch paid 19% interest, 14% more than a comparable domestic dollar account. More-

---

5. The parties agree, as heretofore stated, that, because Citibank's branch was located in Vietnam and because the account was opened and made payable in Vietnam and in Vietnamese currency, Vietnamese law governs the deposit agreements between Citibank's former Saigon branch and Trinh. *See, e.g., Zimmermann v. Sutherland*, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034 (1927); *Dougherty v. National City Bank*, 157 Misc. 849, 285 N.Y.S. 491 (1935); Restatement (Second) of Conflict of Laws § 188 (1971); Uniform Commercial Code § 4–102(2) (1977); Logan and Kantor, *Deposits at Expropriated Foreign Branches of U.S. Banks*, 1982 U. of Ill. L. Rev. 333, 341; Heininger, *Liability of U.S. Banks*

*For Deposits Placed in Their Foreign Branches*, 11 Law & Pol'y Int'l Bus. 903, 944–50 (1969).

6. Article 701 of the Vietnamese Commercial Code (V.C.C.) provided: "The debtor does not have to pay damages if his violation or non-performance of contractual obligations is due to a fortuitous cause or a case of *force majeure*." Article 1206 of the V.C.C. provided: "The depositary is not liable for accidents or risks resulting from *force majeure*, unless previously he has been given notice to return the deposited object."

over, the Federal Reserve Board expressly warned banks that the reserve and interest exemptions would no longer apply to deposits in foreign branches if banks "entered into agreements ... with depositors that in effect guarantee payment of such deposits in the United States if the foreign branch is precluded from making payment." 35 Fed. Reg. 2768 (1970), codified at 12 C.F.R. §§ 204.112(c) and 217.146 (1980).[7] These regulations, Citibank contends, indicate that the parties meant to restrict payment on Trinh's account to Vietnam and Vietnamese currency under any and all circumstances in order to secure the legality of the 19% interest rate.[8]

In sum, Citibank argues that the deposit agreement itself and the legal framework in which the agreement was made reveal the parties' intent to place on the depositor, Trinh, the risk of loss occasioned by a political catastrophe, such as the violent overthrow of South Vietnam and subsequent confiscation and nationalization of Citibank's Saigon branch, that prevents Citibank from paying on the deposits in Vietnam in piasters.

In response, Trinh contends simply that pursuant to general banking principles under Vietnamese as well as American law, a domestic home office is always ultimately liable for the unpaid debts of its foreign branches, though he cites no Vietnam law to that effect. To support his contention,

Trinh relies primarily on the famous *Sokoloff* cases,[9] wherein the New York courts held the National City Bank of New York liable to its Petrograd branch depositors even though the Russian Revolution resulted in the confiscation and nationalization of the Petrograd branch. In so holding, the official referee [10] in *Sokoloff* stated:

Where a bank maintains branches, each branch becomes a separate business entity, with separate books of account ... Nevertheless, when considered with relation to the parent bank, they are not independent agencies; they are, what their name imports, merely branches, and are subject to the supervision and control of the parent bank, and are instrumentalities whereby the parent bank carries on its business, and are established for its own particular purposes, and their business conduct and policies are controlled by the parent bank, and their property and assets belong to the parent bank, although nominally held in the names of the particular branches. *Ultimate liability for a debt of a branch would rest upon the parent bank.*

*Sokoloff v. National City Bank*, 130 Misc. 66, 73, 224 N.Y.S. 102, 114 (1927) (citations omitted) (emphasis added). Moreover, Trinh observes that the *Vishipco* court construed the *Sokoloff* cases to mean that, *as a matter of law*, "[b]y operating in Saigon

---

**7.** The Federal Reserve Board went on to say: "In the Board's judgment, the applicability of these exemptions from [reserve requirements and interest rate limitations] is limited to deposits in foreign branches as to which the depositor is entitled, under his agreement with the bank, to demand payment only outside the United States, *regardless of special circumstances.* Said exemptions are intended principally to enable foreign branches of U.S. banks to compete on a more nearly equal basis with other banks in foreign countries in accordance with the laws and regulations of those countries. *A customer who makes a deposit that is payable solely at a foreign branch assumes whatever risk may exist that the foreign country might impose restrictions on withdrawals.* When payment of a deposit in a foreign branch is guaranteed by a promise of payment at a banking office in the United States if not paid at the foreign office, the depositor no longer assumes such risk, but enjoys substantially the same rights as if the deposit had been made in a U.S. office of the

bank. To assure the effectiveness of [reserve requirements and interest rate limitations] and to prevent evasions thereof, the Board considers that such guaranteed foreign-branch deposits must be subject to those regulations." 35 Fed. Reg. 2768 (emphasis added).

**8.** The majority opinion does not deal with the effect of the Federal Reserve regulation.

**9.** *Sokoloff v. National City Bank*, 239 N.Y. 158, 145 N.E. 917 (1924), and *Sokoloff v. National City Bank*, 130 Misc. 66, 224 N.Y.S. 102 (1927).

**10.** The *Vishipco* court incorrectly identified the referee as "Harrison Tweed, of the Milbank Tweed firm." 660 F.2d at 863. The referee was actually Alfred R. Page. Harrison Tweed was the referee in *Dougherty v. National City Bank*, 157 Misc. 849, 285 N.Y.S. 491 (1935), a case quite damaging to the result reached in *Vishipco.* See discussion, *infra.*

through a branch rather than through a separate corporate entity, Chase accepted the risk that it would be liable elsewhere for obligations incurred by its branch ... U.S. banks, by operating abroad through branches rather than through subsidiaries, reassure foreign depositors that their deposits will be safer with them than they would be in a locally incorporated bank." 660 F.2d at 863. Therefore, in Trinh's view, Citibank's home office in New York is legally bound to pay its Saigon branch depositors regardless of the nature of the circumstances rendering the Saigon branch unable to pay.

I agree with Citibank that Trinh must bear the loss of his savings deposit. I would so hold because I believe the deposit agreement so requires. In my view, the agreement's clear and specific provisions limiting payment on the deposit to Vietnam and to Vietnamese currency, and relieving the Saigon branch of liability for damage to a depositor caused by governmental actions or causes beyond the branch's control, create a legal relationship between Citibank's domestic home office and its Saigon branch requiring the domestic home office to rectify the Saigon branch's failure to pay on a deposit only if such rectification can occur in Vietnam and in piasters. In other words, the provision discharging the Saigon branch of liability serves to discharge the domestic home office of liability as well if the governmental action or other cause precludes payment in Vietnam in piasters. Here, the communist overthrow of South Vietnam and subsequent confiscation and nationalization of Citibank's Saigon branch surely falls within the deposit agreement's discharge-of-liability provision and prevents Citibank's domestic home office from paying Trinh in Vietnam in piasters. Consequently, the deposit agreement calls for Trinh to suffer the loss and, in turn, Trinh's action against Citibank must fail.

This interpretation of the deposit agreement is buttressed, as Citibank correctly points out, by the legal setting in which the Saigon branch operated. An expert on Vietnamese law testified without dispute that under Vietnamese law losses lie where they fall when extraordinary events such as those present here prevent a bank from honoring its obligation to pay on a deposit. If the parties had intended to bind themselves contractually to a different result by making Citibank's domestic home office a complete guarantor of its Saigon branch, they would have so provided explicitly. Furthermore, in order to offer Trinh a 19% interest rate legally, Citibank's Saigon branch had to refrain from making any guarantee of payment on Trinh's deposit in the United States; and in order to offer Trinh a 19% interest rate wisely, Citibank's Saigon branch had to allocate to Trinh the risk of political upheaval.

In addition, the *Sokoloff* cases simply do not stand for the broad general proposition that an American bank's home office is always ultimately liable for the debts of its foreign branches. As perceptively and correctly construed by later New York cases, *see Dougherty v. Equitable Life Assurance Soc'y,* 266 N.Y. 71, 193 N.E. 897 (1934); *Dougherty v. National City Bank,* 157 Misc. 849, 285 N.Y.S. 491 (1935), the *Sokoloff* cases stand solely for the narrow principle that, *under New York law,* an American home office is liable for the debts of its foreign branches confiscated and nationalized by a revolutionary regime where the initial deposit is made *in the United States in dollars.* Thus, the *Sokoloff* cases have no application where, as here, Vietnamese law applies and the initial deposit was made in Vietnam in piasters.

Finally, Trinh is absolutely correct that "U.S. banks, by operating abroad through branches rather than through subsidiaries, reassure foreign depositors that their deposits will be safer with them than they would be in a locally incorporated bank." *Vishipco,* 660 F.2d at 863. But that assurance of greater safety applies, under the deposit agreement, only to credit risks, not political risks. As Citibank's *amicus* brief to the *Vishipco* court explained:

U.S. banks with overseas branches do accept many risks on behalf of their customers, but these risks are economic and not political. For example, Citibank, a debtor when it accepts deposits, assures its depositors that as an institution with massive resources it will stand behind each deposit at each branch, to the extent it can legally do so. Even if the

foreign branch burns down, is unprofitable, becomes insolvent, is robbed or defrauded, or physically disappears by reason of earthquake or other natural disaster, the bank as an institution will continue to operate. In this regard, Citibank and other large banks (domestic or foreign) do provide greater economic security than smaller, local banks.

*Quoted in* Logan and Kantor, *Deposits at Expropriated Foreign Branches of U.S. Banks*, 1982 U. of Ill. L. Rev. 333, 337 n. 9. In other words, Citibank's Saigon branch provided to its depositors greater protection than did local banks because Citibank's domestic home office undertook to stand behind its Saigon branch under virtually all circumstances, all circumstances *except* those in which the governmental actions prevented payment on deposits in Vietnam in piasters. Under the deposit agreement, the risk of those latter circumstances fell on the depositor.

For the foregoing reasons, I would vacate the judgment of the district court and remand for dismissal.