Ana Maria EDELMANN, et al.,
Plaintiffs, Appellants,

v.

The CHASE MANHATTAN BANK, N.A.,
Defendant, Appellee.

No. 87–1885.

United States Court of Appeals,
First Circuit.

Heard March 10, 1988.

Decided Aug. 22, 1988.

As Amended Dec. 16, 1988.

Rehearing and Rehearing En Banc
Denied Dec. 16, 1988.

Guy L. Heinemann, New York City, with whom Edelmiro Salas Garcia, Santurce, P.R., was on brief, for plaintiffs, appellants.

Jay A. Garcia Gregory with whom Fiddler, Gonzalez & Rodriguez, San Juan, P.R., was on brief, for defendant, appellee.

Before BOWNES and BREYER,
Circuit Judges, and WISDOM,* Senior Circuit Judge.

WISDOM, Senior Circuit Judge.

This case involves the liability of a multinational New York bank for deposits in a foreign branch expropriated by the country

* Of the Fifth Circuit, sitting by designation.

in which the branch was located, when the expectation of the parties was that the certificates of deposit were guaranteed by the bank as a whole and would be paid in dollars at any branch of the bank anywhere in the world. In the circumstances of this case, we hold that New York law applies and that the district court erred in granting the bank's motion to dismiss.

The plaintiffs in this case originally lived in Cuba. In December 1958, on the eve of Fidel Castro's final military victory over Fulgencio Batista, the plaintiffs, concerned about the revolution's threat to their property, expressed their fears to the officials of a Cuban branch bank of Chase Manhattan. They purchased from branch banks of Chase Manhattan Bank in Cuba ten "fixed term" bearer certificates of deposit amounting to 250,000 Cuban pesos, the equivalent of $250,000. Eight certificates were payable on "demand" (the plaintiffs' translation) or on "presentation" (the defendants' translation) on June 29, 1959 and two certificates on June 30, 1959. According to the plaintiffs, officers of the bank pointed out that Chase was an American bank with its head office in New York and assured them that the certificates were "like American money", constituted a "guaranteed investment" of their funds, and that United States dollars would be paid to them upon demand and surrender of the certificates to any branch of Chase throughout the world. Allegedly, Chase guaranteed its operations in Cuba with the "capital of the whole bank" and used logos including the map of the United States and the globe. Chase's officers made similar representations to other wealthy Cubans.[1]

Chase Manhattan now sings a different tune: the certificates are not "like Ameri-can money". Indeed, Chase says, the certificates are not even certificates of deposit as we know them in the United States. Chase moved for judgment on the pleadings on the ground that the claim had prescribed. The district court decided that under the "dominant contacts" doctrine Cuban law was applicable.[2] It then agreed with Chase that under Cuban law, as under Puerto Rican law, the certificates were "a variant of a promissory note", subject to prescription of 15 years[3] from their "maturity"; that is, June 29/30, 1959. Because we conclude that the certificates are governed by New York law and are certificates of deposit as defined in the Uniform Commercial Code, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

## I.

Ana Maria Edelmann and her husband, Joseph Saif, bought a total of ten certificates, eight from Chase's main branch in Havana, and two from a smaller branch in Marianao. They paid for the certificates in Cuban pesos. The peso was then pegged to the dollar, interchangeable with the dollar, and the certificates were redeemable, as Chase officials promised, in U.S. dollars at the parent bank in New York or at any Chase branch in the world.[4] At some point Edelmann and Saif lost one of their ten certificates.

The language on the face of the nine existing certificates is identical, except that the "fixed term" is June 29, 1959, on seven of the certificates and June 30, 1959, on the two others.[5] The parties disagree about how best to translate certain language in

1. *See, e.g., Gonzalez–Garcia,* 735 F.2d 645 (2d Cir.1984); *Perez v. The Chase Manhattan Bank, N.A.,* 61 N.Y.2d 460, 474 N.Y.S.2d 689, 463 N.E.2d 5, *cert. denied,* 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984).

2. *Edelmann v. Chase Manhattan Bank, N.A.,* 668 F.Supp. 99 (D.Puerto Rico 1987).

3. *Id.* at p. 102.

4. The certificates do not specify the currency of repayment. In the district court Chase argued that Edelmann and Saif were not entitled to the relief they sought—recovery in U.S. dollars—as a matter of law. The district court did not rule on this argument, and Chase has not raised it on appeal. The Second Circuit affirmed an award in dollars on similar Cuban peso certificates of deposit in *Garcia v. Chase Manhattan Bank,* 735 F.2d 645 (2d Cir.1984). In Cuba the dollar sign was used for both pesos and dollars.

5. The word "maturity" does not appear on the certificate.

the certificates,[6] but the following assertions are indisputably made on each certificate:

1) that the certificate is a certificate of deposit;

2) that a deposit of $25,000 has been made with Chase to be held in favor of the bearer of the certificate;

3) that the certificate is issued under authority given to Chase by Cuban law;

4) that Chase will pay $25,000 to the bearer of the certificate, with interest at 3-1/2 percent on June 29/30, 1959, upon presentation of the certificate; and

5) that the deposit represented by the certificate can be transferred by transfer of the certificate itself.

The certificates, as we read them, obligate the bank to pay interest only until the due date ("fixed term") June 29 or 30, 1959.[7]

Edelmann and Saif did not present their certificates to Chase for payment on June 29 and 30, 1959. Early in September of that year, they fled from Cuba, taking their certificates with them. On September 17, 1960, the Castro regime, through the National Bank of Cuba, expropriated all the deposits and assets of Chase's branch banks in Cuba.[8]

On April 3, 1985, the plaintiffs presented the certificates to a Chase branch bank in Santurce, Puerto Rico, and demanded repayment of their principal plus accrued interest.[9] Chase refused to honor the certificates. Edelmann and Saif then brought this suit in the federal district court in Puerto Rico in May 1985. At this point, it is worth noting that title to a deposit covered by a certificate of deposit passes to the bank and the funds are commingled with the bank's other funds.[10] Speaking generally, but here by explicit agreement, the bearer's presentation and surrender of the bearer certificate to the bank is an express condition to the bank's obligation to pay the principal and accrued interest due on the certificate.[11]

## II.

Both parties to this appeal acknowledge, as they must, that a limitations term, prescription in the civil law, begins to run from the time the cause of action has been established.[12] The central question here is: *When* did Edelmann and Saif first acquire a cause of action against Chase for recovery of their deposits? Chase answers that it was June 29/30, 1959, the first day that Edelmann and Saif could have collected their money under the terms of the certificates. Edelmann and Saif insist that they had no cause of action against Chase until April 3, 1985, the day they presented the certificates for payment to the branch bank in Santurce and were denied payment.

6. See Appendix for a photocopy of a certificate in Spanish and the two translations. On the original certificates are markings or embossment of the name "Chase Manhattan" superimposed on a map of the United States and the phrase "Chase Worldwide Banking". These markings do not show on the photocopy in the Appendix.

7. Chase renders the relevant phrase as: "... it shall stop earning interests [sic] as of its due date". Edelmann and Saif prefer the translation: "... it shall cease accruing interest upon its demand". We find Chase's translation the more accurate of the two translations. Chase's translation suggests that after the fixed term the principal was collectible but that interest was owed only during the fixed term.

8. *See Garcia v. The Chase National Bank,* 735 F.2d 645, 647 (2nd Cir.1984).

9. Although Edelmann and Saif waited 26 years to come forward with their claims, Chase's laches defense is without merit. Laches requires a showing of prejudice. *Cities Service Oil Co. v. Puerto Rico Lighterage Co.,* 305 F.2d 170 (1st Cir.1962). Chase concedes that the deposits were actually made. Even if it is ultimately required to repay the deposits with interest, Chase has not adequately proved prejudice as a result of laches.

10. 5B Michie on Banks and Banking, § 318 at 302 (1983).

11. "A bank acts at its peril in paying a certificate without surrender thereof and endorsement...." (footnotes omitted). 5B Michie on Banks and Banking, § 326a at 317-18 (1983).

12. *See* L. Diez–Picazo, *La Prescripción en el Código Civil* 81 (1964) (civil law); *cf.* 3 W. Blackstone, *Commentaries* 650 (B. Gavit ed. 1941) (common law).

■ There are several approaches to the resolution of this case. The approach we take in resolving this dispute depends on the law that governs the interpretation of the certificates. There are three possibilities that merit discussion: Cuban law, Puerto Rican law, and New York law.[13] In making our choice, we are guided by conflict of law principles that are themselves a matter of federal common law. This is so, as the district court correctly determined, because our jurisdiction in this case is based on the presence of a federal question.[14]

■ The district court stated that to establish which law is to be applied in a 12 U.S.C. sec. 632 case "we need to consider the (a) nature of the transaction; (b) intention of the parties to the contract as to whether any particular law is to be applied; (c) place where the contract was entered into, and (d) place where it may reasonably be expected to be performed. The court must weigh all the criteria to determine the forum that has the *dominant contacts* with the transaction."[15] This is a fair formulation of most of the pertinent considerations in determining the law to be applied in this case. Unfortunately, the court did not consider criteria (b) and (d). Instead, the district court, after referring to the fact that at the time the certificates were issued the Edelmanns resided in Cuba, concluded, without more, that the law of the state with "most contacts with the contract governs"; that the "law closest to the dominant contacts of the transaction was Cuban law". We disagree.

(a) *The nature of the transaction* depends on what law applies. Under New York law, or American law generally, the instrument was a negotiable certificate of deposit. The language of the instrument is that of an American certificate of deposit, not that of a promissory note. Conceivably, for purposes of giving effect to the contract in a civil law jurisdiction, the transaction could be treated as an obligation of the bank, perhaps resembling in some respects a promissory note, to pay the amount evidenced by the certificates on their surrender by the bearer.

(b) *The intention of the parties* is clear. The certificates were to be presented at any branch of Chase in any part of the world *except Cuba.* As the Bank's manager told the plaintiff, the certificates were like American dollars presumably subject to American law.

(c) The residence of the plaintiffs in Cuba, *where the contract was entered into,* loses significance when the purpose of the agreement is to have the most crucial provision, payment, performed in another country by the promissor or debtor headquartered in New York. The plain-

13. The parties have suggested the applicability of various periods of limitation, but if Chase is correct on the issue of commencement, the suit is barred whether we apply a one, three, five, six, or fifteen year statute of limitations. Conversely, if Edelmann and Saif are right, the period of limitation did not start to run until they made demand by presenting the certificates for payment.

14. Nothing in the language of the statute that gives us jurisdiction (The Edge Act, 12 U.S.C. § 632) would support the development of a federal common law response to the *substantive* issue in this case. *See Aaron Ferer & Sons v. Chase Manhattan Bank,* 731 F.2d 112, 121 (2d Cir.1984); *Spectra–Physics v. Chase Manhattan Bank,* 654 F.Supp. 311, 313 (N.D.Cal.1987); *Wyle v. Bank Melli of Tehran,* 577 F.Supp. 1148, 1164 (N.D.Cal.1983).

The Edge Act, 12 U.S.C. § 632, provides that: [n]otwithstanding any other provision of law, all suits of a civil nature ... to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking ... shall be deemed to arise under the laws of the United States....

When jurisdiction is not based on diversity of citizenship, choice of law questions are appropriately resolved as matters of federal common law. *See Aaron Ferer & Sons v. Chase Manhattan Bank,* 731 F.2d at 121 (jurisdiction based on the Edge Act); *Corporación Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 795 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981) (same); *Harris v. Polskie Line Lotnicze,* 820 F.2d 1000, 1003 (9th Cir.1987) (jurisdiction based on the Federal Sovereign Immunities Act); *see generally* Note, *Applicability of State Conflicts Rules when Issues of State Law Arise in Federal Question Cases,* 68 Harv.L.Rev. 1212, 1227–29 (1955).

15. *Edelmann v. Chase Manhattan Bank,* 668 F.Supp. at p. 102.

tiffs unquestionably intended to leave Cuba, and they did, shortly after converting part of their wealth into what appeared to be the equivalent of United States dollars.

(d) The *place where the contract may reasonably be expected to be performed* was a branch bank *not* in Cuba. Because a branch bank, unlike a subsidiary corporation, is an agent of its principal, the ultimate place of performance was, in all likelihood, in Chase's main office in New York.[16]

For a refinement of the choice of law analysis, we turn to the *Restatement (Second) of Conflict of Laws.* According to the *Restatement,* in the absence of guidance from Congress, the factors we must consider in choosing the applicable rule of law in this case include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.[17]

### III.

The first factor in the Restatement focuses our attention on "the needs of ... international systems". Ideally the approach should further "harmonious relations between states".[18]

A choice of law analysis that turned solely on the residence or corporate headquarters of the party issuing a negotiable instrument would no doubt do a disservice to our international financial system.[19] In this case, the presence of Chase's headquarters in New York is only one of several factors that support the application of New York law. Moreover, our concern with "harmonious relations" is necessarily reduced by the fact that United States banks have long been barred from doing business in Cuba. Our decision in this case is unlikely to affect the relationship, such as it is, that now exists between the United States and Cuba.[20]

Puerto Rico is the place where the plaintiffs eventually chose to seek payment from Chase, but it could have been at a Chase branch anywhere in the world. Edelmann and Saif brought their case in federal court; they impose no direct burden on the Commonwealth of Puerto Rico.

The next two *Restatement* factors consider the relevant policies of the forum and other interested states. By basing jurisdiction on 12 U.S.C. § 632, of course, the plaintiffs have chosen a federal forum. The legislative history of the Edge Act does not suggest explicitly a relevant federal policy, but there can be little doubt that Congress passed the Act to promote uniformity in the rules governing the international operations of United States banks.[21] We conclude that this policy is

---

**16.** *See* n. 22.

**17.** Restatement (Second) of Conflict of Laws § 6(2) (1971).

**18.** Restatement (Second) of Conflict of Laws § 6 comment d.

**19.** Under this approach it might be difficult for foreign nations to regulate the conduct of United States banks doing business abroad.

**20.** "We are not challenging the validity of the Cuban government's actions here and Cuba has shown no interest in the outcome of this case. We are simply resolving a private dispute between an American bank and one of its deposi-

tors. The result we reach will have no international repercussions. Chase cannot use the act of state doctrine as a defense because the doctrine is not implicated." *Garcia v. Chase Manhattan Bank,* 735 F.2d 645, 651 (2d Cir.1984).

**21.** *Cf. People ex rel. Cosentino v. Federal Reserve Bank,* 579 F.Supp. 1261, 1264–66 (N.D.Ill.1984) (discussing a parallel clause that pertains to federal reserve banks). Congress adopted the jurisdictional language in 12 U.S.C. § 632 as section 15 of the Banking Act of 1933. At that time, of course, federal jurisdiction allowed courts to apply federal common law under *Swift v. Tyson,* 41 U.S. (16 Pet) 1 (1842), 10 L.Ed. 865.

best served by applying New York law and the Uniform Commercial Code to these Chase Manhattan certificates of deposit.

The other states involved here do not have compelling interests at stake. Puerto Rico's connection with the matter is fortuitous. It is inconceivable that Puerto Rico's banking and contract laws were framed to define rights created by a certificate issued in Cuba to Cuban citizens cashable anywhere by a branch of a New York bank.[22] Cuba's policies, of course, have changed considerably since 1959. Although international banking may be sensitive to the issue presented in this case, we find no Cuban interest in this case that can fairly be characterized as "relevant". Current Cuban law is hostile to United States banks and to Cuban emigrants.[23] Cuba is unquestionably indifferent to the plaintiffs' claim against Chase.[24]

New York is an international banking center with a legitimate interest in Chase's foreign operations. The issue presented in this case is a matter of concern to New York. New York has an interest in preserving and extending the American banking custom "that demand [on "a New York banking entity"] will be made [on a certificate of deposit] before any ... liability is incurred by the bank".[25] As the plaintiffs

point out, this custom generally serves to protect banks from multiple liability and unnecessary litigation.

Our next factor, the protection of justified expectations, deserves particular weight on the facts of this case. According to the complaint, Edelmann and Saif went to Chase to protect some of their wealth from risks they associated with the coming Castro revolution. Chase described the certificates of deposit as a way to escape from impending changes in the Cuban legal order. Chase encouraged Edelmann and Saif by telling them that the certificates were "like American money".[26] As we have emphasized before, if there is one source of law the parties did *not* want to govern their relationship it was Cuban law.[27]

The basic facts in this case distinguish it from the early cases that grew out of the Communist expropriation of deposits in Russia. The deposits were made in rubles in foreign branches of U.S. banks in Russia under Russian law before and after the revolution. There was no contractual liability or expectation of payment from the parent bank.[28] Or the deposit was payable in rubles in Russia.[29] Or the bank was

---

**22.** Although Chase Manhattan is now a federally chartered banking association, the record reflects that before 1964 Chase was "a New York Banking entity". *See* Defendant's Reply Memorandum in Support of Dismissal at p. 16 n. 8. Chase admitted in its pleadings that its offices in Cuba were branches rather than subsidiaries. "[Branches] are subject to the supervision and control of the parent bank, and are instrumentalities whereby the parent bank carries on its business." *Vishipco Line v. Chase Manhattan Bank, N.A.,* 660 F.2d 854, 863 (2d Cir.1981), *cert. denied,* 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982), *quoting Sokoloff v. National City Bank,* 130 Misc. 66, 73, 224 N.Y.S. 102 (Sup.Ct. N.Y.City 1927).

**23.** *See generally Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875 (2d Cir. 1981) (describing Cuban Law No. 951 of July 1960, which expropriated the assets of United States banks and other U.S. firms doing business in Cuba); *Garcia v. Chase Manhattan Bank,* 735 F.2d 645 (2d Cir.1984) (describing Cuban Law No. 78 of February 1959, which established the Ministry of Recovery of Misappropriated Property to recover "property of any

type that has been removed from the National Wealth").

**24.** *See* n. 20.

**25.** N.Y. U.C.C. § 3–122 official comment (McKinney 1964 & Supp. 1988).

**26.** This expression contains an implicit reference to American legal principles. Under the U.C.C. a certificate of deposit—"like American money"—can be tucked away in a mattress without losing its value.

**27.** The reference in the certificates to the Cuban statute that authorized banks to issue certificates of deposit does not affect this conclusion. We note in passing that Chase labelled the instruments "certificados de deposito", rather than using "certificados de credito", the pertinent expression that appears in Cuban Law 13.

**28.** *Dougherty v. National Bank of New York,* 157 Misc. 849, 285 N.Y.S. 491 (1935).

**29.** *Tillman v. National City Bank of New York,* 118 F.2d 631 (2d Cir.1941).

relieved of liability by the defense of *force majeure* and by involuntary novation.[30]

Edelmann's and Saif's allegations receive indirect support from the relatively low interest rate that Chase offered on the certificates. In 1959 short-term United States government certificates of indebtedness paid an average of 4.11 percent.[31] The certificates at issue here earned only 3.5 percent. This rate suggests that the certificates were payable in dollars in New York. In war-torn Vietnam, shortly before the fall of Saigon, certificates of deposit carried 19 percent interest.[32] Edelmann and Saif gave up cash for credit. Had the certificates been payable only in Cuba, we would expect them to carry an interest rate high enough to reflect the "risk premium". They do not.

The record contains nothing to suggest that the parties contemplated repayment in Puerto Rico. Indeed, it is not clear from the record that Chase had a branch in Puerto Rico in 1959. The plaintiffs do allege, however, as we have emphasized, that Chase's officers told them "that Chase was an American bank with offices in New York"; that the certificates would be payable in dollars, and payable in the United States. We conclude that we can best satisfy the parties' justified expectations by applying New York law to these certificates.

We consider the next two factors together. Certainty, predictibility, and uniformity, are, as the *Restatement* acknowledges, important values in all areas of the law.[33] They are especially desirable in cases involving negotiable instruments. This militates in favor of a simple rule such as the one set forth in section 214 of the *Restatement*. Section 214 directs courts to apply the law of the place of payment if it is specified in the instrument; otherwise, courts should apply the law of the place where the instrument was issued. There was no place of payment specified in the certificates here.

As the official comments state, however, certainty and predictability can be "purchased at too great a price".[34] In this case, the section 214 approach would require us to apply the law of Cuba. But to apply Cuban law would be to defeat the plaintiffs' legitimate expectations in going to Chase in the first place. Furthermore, because of the special difficulties involved in determining the Cuban law that governs certificates of deposit,[35] we conclude that the bright line approach of section 214 would promote confusion in this case, rather than certainty.

Predictability would not be furthered by any analysis that leads to Puerto Rican law. Predictability, of course, must be measured at a time when the parties are still free to modify their relationship. Unlike New York, Puerto Rico had no connection with this case at the time the certificates were issued. New York is where the bank drafted the world-wide uniform certificates, and the record supports the view that the parties contemplated performance in the United States and probably in New York. Puerto Rico is merely the current residence of the plaintiffs, and the place where they happened to seek performance. If this case were governed by the laws of Puerto Rico, the holders of similar certificates of deposit could choose to be governed by the laws of any country in the

---

**30.** *Id.*

**31.** U.S. Bureau of the Census, *Statistical Abstract of the United States* 468 (84th ed. 1963).

**32.** *Trinh v. Citibank*, 623 F.Supp. 1526 (E.D. Mich.1985), *aff'd*, 850 F.2d 1164 (6th Cir.1988). The U.S. Department of Justice filed a brief as amicus curiae on behalf of the Departments of State and Treasury, the Federal Reserve Board, the Comptroller of the Currency and the Federal Deposit Insurance Corporation. The principal argument of the Government's brief was that the deposit agreement placed the risk of sovereign government action or *force majeure* on the depositor. The substantially higher interest (19%) on the deposit as compared with a similar deposit in the United States was evidence that the depositor bore the sovereign risk on the deposit.

**33.** Restatement (Second) of Conflict of Laws § 6 comment i.

**34.** *Id.*

**35.** These problems are discussed below in detail.

world where the issuing bank maintained a branch office. This could lead to unfettered forum shopping, to unpredictability and, in many cases, unfairness as well.[36]

The final factor in the *Restatement* approach considers "ease in the determination and application of the law to be applied". Although this factor is usually of secondary importance, in this case it completely disqualifies Cuban law. To begin with, we find no precedent to support the district court's application of Cuban law as it stood in 1959.[37] The district court took "judicial notice that the Cuban government has repealed all laws that recognize private property and private commercial dealings ...". Accepting this statement as correct for the sake of discussion, we disagree with the court's conclusion that "[s]uch uncivilized doing has no bearing here ...". If this dispute is governed by Cuban law, it is governed by *current* Cuban law. If we cannot take judicial notice, we can make an educated guess; it is likely that Cuba has chosen not to give retroactive effect to post-revolutionary developments in its commercial law, but we have uncovered no authority to support or to deny this proposition.

Even if pre-Castro Cuban law governed the interpretation of the certificates, we would still be faced with some irreducible uncertainty. Cuba authorized the issuance of certificates of deposit in 1948.[38] If we apply the fifteen year prescriptive period urged by Chase,[39] it is arithmetically apparent that no certificates of deposit prescribed in Cuba before Castro's accession to power in 1959. Thus it is not surprising that neither Chase nor the district court refers us to any Cuban authority that is directly on point.

Chase justly describes Spain as the fountainhead of Cuban law.[40] With respect to the legal attributes of a certificate of deposit in 1959, however, Spanish law does not specifically give us an answer. Certificates of deposit were not authorized in Spain until 1969.[41] Indeed, guidelines issued at the end of the nineteenth century strictly prohibited Spanish banks from issuing negotiable "receipts of deposits".[42] In short, any analysis of the problem in this case under Cuban or Spanish law must proceed by drawing an analogy between certificates of deposit and various civilian substitutes.

Chase suggests that Cuban law would treat its certificates of deposit as promissory notes are treated.[43] This assertion is speculative, at best. The certificates themselves purport to represent deposits, not loans. Although bank deposits differ in several respects from the "regular" depos-

**36.** Edelmann and Saif note that Chase now protects itself from uncertain choice of law rules by specifying the applicable law on the face of its certificates.

**37.** Although the district court sets out to interpret preCastro Cuban law, it relies on Spanish sources published during the 1970s. This approach is difficult to justify in view of the changes that have taken place in Spanish commercial law since the 1950s, including the authorization of certificates of deposit in 1969. *Compare* J. Garrigues, *Contratos Bancarios* (1958) *with* J. Garrigues, *Contratos Bancarios* (2d ed. 1975).

**38.** Ley 13 de 23 de diciembre de 1948, Art. 115, *reprinted in* A. Fuentevilla, *Legislación Bancaria Cubana* 183–200 (1955).

**39.** *See* Cuban Civil Code, Art. 1964.

**40.** *See generally* D. Tejera, *Estado de la legislación Cubana y de la Influencia que Ejerzan en ella la de España y de Otros Paises,* 50–52 (1925); J. Olavarria, *Los Códigos de Comercio Latinoamericanos* 205 (1961).

**41.** Orden Ministerial de 24 de avril de 1969, *reprinted in* I. Arroyo & M. de Gispert, *Código de Legislación Bancaria* 790 (2d ed. 1987). Unlike the certificates in this case, Spanish certificates of deposit are subject to a maximum term of five years imposed by statute. *Id.*

**42.** Real Orden de 10 de diciembre de 1894, no. 4. *See generally* F. Cremades, *Certificados de Depósito en las Imposiciones a Plazo* 33–36 (1979).

**43.** *But see* J. Bugeda, *A Statement of the Laws of Cuba in Matters Affecting Business* 228 (2d ed. 1958) (suggesting that a promissory note in Cuba must identify itself as such). If the certificates at issue in this case were in fact promissory notes, a suit for nonpayment would have begun to prescribe on their due dates in June 1959.

its described in the Spanish Civil Code,[44] most post-civil war Spanish commentators have concluded that bank deposits are "irregular" deposits—and not loans.[45] Under Spanish law "the cause of action of the depositor is created at the moment that the depositary denies return of the thing deposited, and not before".[46] If the certificates in this case are treated as "deposits", Edelmann and Saif's cause of action did not begin to prescribe until they presented their certificates to Chase's branch bank in 1985.[47]

The distinction in Spanish commercial law between deposits and loans has been described as an "ancient and serious controversy".[48] One respected commentator has pointed out that the word "deposit" derives from the latin verb "ponere", which suggests the placing of one's trust in another, while the Spanish legal term for a loan is related to the verb "mutare", which

suggests a change in ownership.[49] With the certificates at issue in this case, however, one finds *both* an entrusting and a transfer of legal ownership.

Other commentators state that "courts will resolve the [deposit vs. loan] question according to the circumstances, especially by the intentions of the parties".[50] In this analysis, a "deposit" is made to achieve security and liquidity while a "loan" is made as a "productive investment".[51] Though hardly a bright line test, this represents our best estimate of pre-Castro Cuban law.

There can be little doubt that Edelmann and Saif went to Chase for financial security at a time when Castro was about to take over the government of Cuba.[52] It is arguable, however, that they sacrificed liquidity by accepting a six-month term. Several Spanish commentators have asserted that a

**44.** In the case of "regular" deposits, which we would call bailments, the depositary is not permitted to use the *tantumdem,* or the thing deposited, without the express consent of the depositor. Spanish Civil Code Art. 1767. A bank deposit, by contrast, could not pay interest unless the depositary invested the funds deposited along with its general funds.

**45.** *See, e.g.,* R. Uria, *Derecho Mercantil* 667 (12th ed. 1982); M. Broseta, *Manual de Derecho Mercantil* 456 (4th ed. 1981) ("... the majority view is that a bank deposit of money is not a loan but an irregular deposit ..."); J. Martinez Val, *Derecho Mercantil* 512 (1979); *see also* M. Sanchez, 2 *Leyes Civiles de Cuba* 365 (2d ed. 1951) (same conclusion reached by Cuban commentator). Older authorities who treated all bank deposits as loans have been criticized for disregarding the parties' intentions, *see* L. Diez–Picazo & A. Gullon, 2 *Sistema de Derecho Civil* 487 (3d ed. 1982), and for "obstinately ignoring reality". Flores Micheo, *El Depósito Irregular,* 47 Rev. Derecho Privado 753, 753 (1963). As Flores Micheo remarked in a widely quoted article:
[B]efore Rome, in Rome, in the Middle Ages, in modern times, and more than ever in the banking world of today there exist millions of contracts in the form of irregular deposits that are never considered or desired to be anything but true deposits.
*Id.* at 753–54.
In Louisiana, the relationship between a bank and its depositors is treated as a loan in some contexts and as a deposit in others. *See, e.g., LaCour v. Merchants Trust and Savings Bank,* 153 So.2d 599, 601 (La.Ct.App.4th Cir.), *cert. denied,* 244 La. 1004, 156 So.2d 56 (1963). Louisiana has now adopted portions of U.C.C. The

commencement of prescription on a certificate of deposit in Louisiana is governed by the U.C.C. The issue apparently never arose under the pre-U.C.C. regime. *Miller v. Bank of New Orleans,* 426 So.2d 1382, 1383 (La.Ct.App. 4th Cir. 1983).

**46.** J. Garrigues, *Contratos Bancarios* 394 (1958).

**47.** *Id.* Chase's argument that this result conflicts with Article 1932 of the Cuban and Spanish Civil Codes is without merit. Article 1932 does not govern the creation of rights but the extinction of rights that have already been established.

**48.** Flores Micheo, 47 Rev. Derecho Privado at 753; *see also* D. Espin, 3 *Manual de Derecho Civil Español* 703 (6th ed, 1983) ("highly controverted").

**49.** J. Castan, 3 *Derecho Civil Español, Común y Foral* 184 293 (6th ed. 1944).

**50.** D. Espin, 3 *Manual de Derecho Civil Español* at 704.

**51.** *Id.*

**52.** Professor Uria suggests a presumption that all bank deposits are made for "custodial purposes". R. Uria, *Derecho Mercantil* 667. We note that under pre-Castro Cuban law time deposits took priority over demand deposits in the event of a bank liquidation. J. Bugeda, *A Statement of the Laws of Cuba in Matters Affecting Business* 237.

*term* deposit should usually be treated as a loan.[53] But the certificates in this case were readily negotiable. More importantly, they permitted early withdrawal with a penalty. If Edelmann and Saif had continuous access to the value of their certificates, it is difficult to see why, for prescriptive purposes, their contract with Chase should not be treated as an "irregular" deposit.

Like most banking law questions in civilian jurisdictions, the availability of early withdrawal on a certificate of deposit is governed by statutes and regulations rather than codal provisions. The Mexican *bono de ahorro* and the French *bon de caisse à échéance fixe* can always be sold back to the bank of issuance; not so the Italian *buono fruttifero*.[54] Unfortunately the Cuban law on this point is unclear. The certificates themselves refer to regulations issued by the National Bank of Cuba, but we have been unable to find these regulations and they may not exist.[55]

In short, a proper analysis of this case under Cuban law would require us to grapple with post-revolutionary legislation that neither party has seen fit to compile, describe, cite, or even mention. In addition, if we seek to apply general civil law principles to the dispute we find that the commencement of prescription depends on whether a negotiable fixed-term deposit would be classified as an "irregular deposit" or a loan. But this depends on the characteristics of a "certificado de deposito" under Cuban banking practices and Cuban banking regulations that cannot be determined and cannot be borrowed from other civil law jurisdictions.

Puerto Rico is governed by the Uniform Negotiable Instruments Law, a forerunner of the U.C.C. Unfortunately the N.I.L. does not address the issue in this case with any precision.[56] The next step would be to apply pre-N.I.L. Anglo-American principles.[57] Chase contends that the N.I.L. itself directs us to Puerto Rico's civil and commercial codes.[58] The most relevant

---

**53.** M. Broseta, *Manual de Derecho Mercantil* 456; J. Garrigues, *Contratos Bancarios* 357 (1958) J. Martinez Val, *Derecho Mercantil; cf.* M. Planiol & G. Ripert, 11 *Treatise on the Civil Law* No. 2214 (La.St.L.Inst. trans. 1959) (same result under French law). Professor Uria, though unwilling to go as far as other commentators, concedes that a bank deposit with a term "rather approximates" a loan. R. Uria, *Derecho Mercantil* 667.

**54.** *See* F. Cremades, *Certificados de Depósito en las Imposiciones a Plaza* 44–56.

**55.** We note that no official text of the Cuban Commercial Code of 1886 was ever published; disparate editions were allowed to circulate and promised clarifications and improvements were never made. J. Olavarria, *Los Códigos de Comercio Latinoamericanos*, 201, 205. As one pre-Castro Cuban observer wrote, "[t]he state of legislation in Cuba is detestable". D. Tejera, *Estado de la Legislación Cubana y de la Influencia que Ejerzan en ella la de España y de Otros Paises* 7.

**56.** The inadequacy of § 70 of the N.I.L. attracted the attention of Professor Ames in 1900. *See* Ames, *The Negotiable Instruments Law*, 14 Harv. L.Rev. 241, 253 (1900); *see also* Ames, *The Negotiable Instruments Law: A Word More*, 14 Harv. L.Rev. 442, 447–48 (1900). Ames urged states adopting the N.I.L. to be explicit in codifying the pre-N.I.L. rule that banknotes and certificates of deposit do not create causes of action until they are presented for payment. Although

the language suggested by Ames was not incorporated in the N.I.L., thus creating "considerable uncertainty", Turner, Revision of the Negotiable Instruments Law, 38 Yale L. J. 25, 43 (1928), most states that considered the problem adopted the pre-N.I.L. result, either by judicial interpretation or by statute. *Dean v. Iowa–Des Moines Nat. Bank & Trust Co.*, 227 Iowa 1239, 290 N.W. 664 (Iowa 1938); Recent Case 52 Harv.L.Rev. 524 (1939); Annotation, Statute of Limitations as Applied to Certificate of Deposit, 128 A.L.R. 157 (1940).

**57.** Edelmann and Saif rely heavily on *Acevedo v. Citibank*, 84 J.T.S. 89 (Oct. 31, 1984). In *Acevedo* the Puerto Rico Supreme Court recognized that the drafters of the N.I.L. sought to codify Anglo–American common law. We do not read *Acevedo* to mean that in adopting the N.I.L. Puerto Rico adopted Anglo–American common law as a general residual source of legal authority.

**58.** Chase points in particular to § 386 of the Puerto Rico Negotiable Instruments Law, 19 L.P.R.A. § 386, *reprinted in* B. Santiago, Tratado de Instrumentos Negociables 1043 (2d ed. 1981). Section 386 provides that "[i]n any case not provided for in this title, the rules of the Law Merchant, Civil Law and Equity govern". According to Chase, Law Merchant—*el derecho mercantil*—"obviously refers to the Puerto Rico Commercial Code". Edelmann and Saif maintain that *derecho mercantil* is a reference to the universal *Lex Mercantoria*, and that *Lex Merca-*

Puerto Rican authorities are, as counsel for the plaintiffs conceded in oral argument, "somewhat schizophrenic".

In a strict civil law analysis, the case of *Treasurer v. Banco Comercial* suggests that Puerto Rico treats a certificate of deposit as a loan—at least for bankruptcy purposes.[59] On the other hand, *Banco Comercial* and other cases that have been cited to us resort freely to "modern American jurisprudence".[60] Professor Santiago's respected treatise on negotiable instruments uses a Massachusetts case to establish the holder in due course rule for certificates of deposit in Puerto Rico.[61] As we point out, "modern American jurisprudence" favors the plaintiffs.

Puerto Rican law is more accessible than Cuban law, but it does not offer an easily determinable rule for deciding this case. New York, by contrast, has adopted law that is directly on point.[62] Under the final factor in the *Restatement* test, this strengthens the other arguments for applying New York law.

We hasten to observe that a clear legal rule that is squarely on point represents more than a convenient short cut for judges. The final *Restatement* factor reinforces values that lie at the heart of choice of law doctrine.[63] Mere simplicity does not replace the need for relevant contacts between the dispute and the state whose law is to be applied. But when these contacts exist, as they do in the present case, we find that the determinacy and applicability of the substantive laws at issue are legitimate factors in the overall choice of law analysis.

We conclude that the accrual of the plaintiffs' right to sue Chase on its certificates of deposit must be determined under New York law, the law controlling the parent bank—the ultimate obligor.

## IV.

■ Under New York law, a certificate of deposit must be in writing and must include "an acknowledgment by a bank of receipt of money with an engagement to repay it".[64] The certificates at issue here satisfy this definition. Because they provide a definite date for repayment, they are "time certificates of deposit".

■ In New York, as in 49 other states, "[a] cause of action against the obligor of a demand or a time certificate of deposit accrues upon demand ...".[65] Edelmann

*toria* would follow Anglo–American principles in this case. Although the meaning of section 386 is hardly obvious, we note that Professor Santiago translates *Lex Mercatoria* as "la ley de los commerciantes", a fact that tends to support Chase's interpretation of § 386. *See* B. Santiago, *Tratado de Instrumentos Negociables* 19.

**59.** 46 P.R.R. 298, 301–303 (1934). The *Banco Comercial* court follows the venerable Spanish commentator Manresa in holding that *all* general bank deposits are loans. This view, which rejects the concept of "irregular deposits", lost favor in Spain, and apparently in Cuba, about 1940. See note 45 above.

**60.** *Banco Comercial,* 46 P.R.R. at 321; *Portilla v. Banco Popular,* 75 P.R.R. 94, 107 (citing *Michie on Banks and Banking*).

**61.** B. Santiago, *Tratado de Instrumentos Negociables* 178. The case is *National Surety Co. v. Allen,* 243 Mass. 218, 137 N.E. 533 (1922). Chase tries to distinguish the issue in *Allen* from the statute of limitations question in this case. It is true, of course, that the issues are distinct. An instrument may be overdue for holder in due course purposes before its limitations period has expired. But to distinguish *Allen,* Chase

must argue the converse, that an instrument can be transferred to a holder in due course *after* the statute of limitations has run. We are not persuaded.

**62.** N.Y.U.C.C. § 3–122(2).

**63.** When parties enter a contractual relationship that crosses state or national boundaries, for example, their expectations with respect to undefined terms in the contract will tend to depend on law that is accessible and easy to apply. A simple rule promotes predictability, certainty, and uniformity from case to case. Finally, a state that enacts applicable laws has demonstrated at least some interest in the resolution of cases that are governed by those laws.

**64.** N.Y. U.C.C. § 3–104(2)(c).

**65.** N.Y. U.C.C. § 3–122(2). As the official comment to § 3–122 observes, certificates of deposit "are issued with the understanding that they will be held for considerable length of time, which in many instances exceeds the period of the statute of limitations". The rule reflected in § 3–122 has been the law of New York for more than 120 years. *See Payne v. Gardiner,* 29 N.Y. 146 (1864).

and Saif demanded payment from Chase on April 3, 1985.[66] A month later they filed this suit. Under New York's six year statute of limitations for breach of contract actions,[67] Mrs. Edelmann and her husband are not barred from suing Chase on the certificates.

## V.

Considering the position of United States in international banking, our relationship to countries in the throes of revolution or coming out of revolution and attempting to provide a stabilized or stabilizing government, we are strongly pulled not to penalize an international bank. Giving full weight to this inescapable factor in the totality of circumstances incident to this case, we consider that on the facts, *in this particular case*, bearing in mind Chase Manhattan's representations, here and abroad, a fair reading of the certificates of deposits, especially as represented by the branch officers, requires that the expectations of the parties control the decision. Perhaps the plaintiffs did not make any demand earlier than they did because they thought that the value of their certificates of deposit had evaporated with all else that they lost to Castro. The hard truth is that they put in the hands of Chase Manhattan of New York $250,000, prodded into doing so by representations that they would be protected, against whatever Castro did. As the court said in *Garcia:*

> Chase's debt to Dominguez and Garcia was not extinguished merely because it was forced to pay an equivalent sum of its own money to a third party.... Chase would not argue that its debt was extinguished if an armed gunman had entered its Vedado branch and demanded payment of a sum equal to the amount of its debt to Dominguez and Garcia.[68]

Here, Castro's Cuba armed with its powers of expropriation, entered Chase's Cuban branches and demanded payment of a sum equal to the amount of the deposit owed to Edelmann and Saif.

We have been unable to find a case directly on point on the question of prescription. There are cases, however, that deal with the liability of the parent bank for branch bank deposits expropriated by a foreign government. Most of these cases turn on the act of state doctrine. Although that doctrine is an affirmative defense, which may be associated at the trial, the cases are significant here because they deal with the expectation of the parties and the relationship between a parent bank and its branches located abroad.

In its answer to the complaint Chase mentions the act of state doctrine as one of its affirmative defenses, but Chase did not discuss the relevant cases in the district court or in our Court. The reason for this may have been the adverse decision of the Court of Appeals for the Second Circuit in *Garcia v. Chase Manhattan Bank.*[69] The basic facts in *Garcia* are similar to the facts in the instant case.

*Garcia v. Chase Manhattan* involved two certificates of deposit amounting to $760,383.30, that a Cuban branch bank had issued in March and September 1958. As in the instant case, the bank officials had stated to the depositors that "Chase's main office in New York would guarantee the certificate and that they could be repaid [in dollars] by presenting the certificate at any Chase branch world wide".[70] A divided Court held that the bank was liable for repayment in New York despite the expropriation by the Cuban government. That decision was based upon the factual finding of a jury that the deposit agreement was

---

**66.** *See* N.Y. U.C.C. § 3–505(1). "Demand occurs upon presentment and refusal to pay". *Garcia v. Chase Manhattan Bank, N.A.,* 735 F.2d 645, 648 (2d Cir.1984) (applying New York law).

**67.** N.Y.Civ.Prac.Law § 213 (McKinney 1972 & Supp. 1988).

**68.** *Garcia v. Chase Manhattan,* 735 F.2d 645, 649 (2d Cir.1984).

**69.** 735 F.2d 645 (2nd Cir.1984). Garcia commenced the action in the United States District Court for the District of Puerto Rico. Judge Jose V. Toledo transferred the case to the Southern District of New York under 12 U.S.C. § 94 (1976; substantially amended 1982).

**70.** *Id.* at 646.

varied by the oral representations made by officers of the Cuban branch identical with the representations allegedly made to the plaintiffs here. Chase raised the issue that the Puerto Rican statute of limitation should be applied and barred recovery. The Court of Appeals looked to the law of New York.[71] Under that law, the "cause of action on a certificate of deposit accrues upon demand. N.Y.U.C.C. § 3–122(2). Demand occurs upon presentment and refusal to pay. Id; N.Y.U.C.C. § 3–504. Garcia's formal demand in this case occurred with the filing of her complaint" [72] in 1976. That holding sustains the position of the plaintiffs in this case. With that issue out of the way, the Garcia Court held that the act of state doctrine did not bar recovery; the Cuban government action was not implicated; this was a private dispute between Garcia and Chase. "Where, as here, the debtor-creditor relationship was created primarily to ensure the safety of the creditors' funds, a debtor's payment to a third party of a sum equal to that owed the creditors does not extinguish the original debt. Thus, the actions of the Cuban government did not accomplish the cancellation of Chase's obligation to ensure the safety of Garcia's funds." [73]

In Garcia the jury made the factual finding that the oral representations made by officers of the Cuban branch bound the parent bank. These are the identical representations Edelmann and Saif alleged in their complaint. Their appeal is from a judgment dismissing the complaint; their alleged facts are accepted as true.

The case cited in the Garcia opinion, Vishipco Line v. Chase Manhattan Bank,[74] involved certificates of deposit the plaintiffs purchased from a branch bank in Saigon. Chase closed the bank shortly before the North Vietnamese occupied Saigon and confiscated all commercial establishments including banks. When sued in New York, Chase contended, among other contentions, that it no longer owned the deposits and that the act of state doctrine barred any challenge to the validity of the governmental seizure. The Court of Appeals upheld the depositor's claim, quoting from one commentator:

> [I]f the branch is closed, [in that case before nationalization] ... the depositor has a claim against the home office; thus, the situs of the debt represented by the deposit would spring back and cling to the home office.[75]

The Court also quoted Justice (then Judge) Cardozo's language from Sokoloff v. National City:

> [W]hen considered with relation to the parent bank, [foreign branches] are not independent agencies; they are, what their name imports, merely branches, and are subject to the supervision and control of the parent bank, and are instrumentalities whereby the parent bank

71. Id. at 648. The Court further explained in a footnote:

Garcia advances a number of reasons why the Puerto Rican statute of limitations should be applied despite the transfer under former section 94. The point is moot, however, due to our conclusion that her action is not barred by the shorter New York statute of limitations.

We note that jurisdiction is not exclusively based on diversity of citizenship. However, since there is no applicable federal statute of limitations, it is appropriate to look to state law.

72. Id. at 648. The Court added:

The purpose of the agreement between Chase and Dominguez and Garcia was to ensure that, no matter what happened in Cuba, including seizure of the debt, Chase would still have a contractual obligation to pay the de-

positors upon presentation of their CDs. Garcia and Dominguez selected Chase because of its international reputation. Chase was aware of their desire to safeguard their money and assured them that their funds were protected. Chase "accepted the risk that it would be liable elsewhere for obligations incurred by its branch." Vishipco Line v. Chase Manhattan Bank, N.A., 660 F.2d 854, 863 (2d Cir. 1981), cert. denied, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982).
Id. at 650–51.

73. Garcia, 735 F.2d at 649.

74. 660 F.2d 854 (2d Cir.1981), cert. denied, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982).

75. Heininger, Liability of U.S. Banks for Deposits Placed in Their Foreign Branches, 11 Law & Pol. Int'l. Bus. 903, 975 (1979).

carries on its business.... [76]

*Sokoloff* is distinguishable on the facts from the instant case, but its underlying premise is apposite here. When a branch is closed, the depositor has a claim against the parent bank; the situs of the debt represented by the deposit "springs back" to the home office. Ultimate liability for the debt of a branch rests upon the parent bank.

More recently, on July 8, 1988, in *Trinh v. Citibank*,[77] involving a deposit in a savings account in the Saigon branch of Citibank, the Court of Appeals for the Sixth Circuit "placed the risk of loss arising from a political revolution [again in Vietnam] on the domestic home office of the American bank rather than on the individual depositors".[78] The case for the depositor is not as strong as the case for Edelmann and Saif or for Garcia in at least two respects. (1) The Court of Appeals agreed with the district court that the law of Vietnam applied. Article 701 of the Vietnamese Code provided: "The debtor does not have to pay damages if his violation or nonperformance of contractual obligations is due to a fortuitous cause or a case of *force majeure*".[79] (2) Moreover, the deposit agreement itself provided that "Citibank does not accept responsibility for any loss or damage suffered by or incurred by any depositor resulting from government orders, laws or ... from any other cause beyond its control" and that payment would be made only in Vietnam in piasters.[80] Interest was fixed at 19 percent. Citing *Sokoloff (see n. 76)* and Heininger *(see n. 75)* the Court said, "it is a general banking principle that the home office is *ultimately liable* on a deposit placed in its foreign branch if, as

here, the branch closes or otherwise wrongfully refuses to return a deposit".[81] The situs of the deposit was no longer Vietnam at the time the appropriation took place but had "sprung back" to the head office of Citibank in New York.[82] "[A]s recognized by the Court in *Vishipco* [branch banking enabled] those deposits in foreign banking to gain more protection than they would have received had their money been deposited in locally incorporated subsidiaries of foreign banks".[83] Again citing *Vishipco*, the Court said: "By operating a branch office in Vietnam, Citibank indicated to its foreign depositors that it accepted the risk that, in at least some circumstances, it would be liable elsewhere for obligations incurred by its branch, *Vishipco*, 660 F.2d at 863."[84] In so doing, it "reasure[d] [those] depositors that their deposits [would] be safer with them than they would be in a locally incorporated bank".[85] "[T]hese depositors expected that Citibank, with its worldwide assets and international reputation would be 'good' for the deposits if, for *whatever reason* ... Citibank Saigon could not return them".[86] (Emphasis in the original) In the instant case there were not just "indications" and inferences to support the bank's liability; as in *Garcia*, there were allegedly explicit representations to the depositor that the certificates of deposit were good worldwide on demand.

The same year the court in *Garcia* held that the act of state doctrine did *not* release Chase of its obligation to depositors, the Court of Appeals of New York, on virtually identical facts, held that the act of state doctrine *did* relieve Chase of its obligation to branch depositors. *Perez v.*

---

**76.** 239 N.Y. 158, 145 N.E. 917 (1924). *Sokoloff* involved a deposit made in New York in dollars.

**77.** 850 F.2d 1164 (6th Cir.1988). The district court decision is reported at 623 F.Supp. 1526 (E.D.Mich.1985).

**78.** 850 F.2d at 1165.

**79.** *Id.* at 1168, fn. 3.

**80.** *Id.* at 1166.

**81.** *Id.* at 1168.

**82.** *Id.* at 1167.

**83.** *Id.* at 1169.

**84.** *Id.* at 1169.

**85.** *Id.* at 1169, *citing* Heininger (n. 75 at 911–12).

**86.** *Id.* at 1169.

*Chase Manhattan Bank.*[87] There is now pending on appeal, *Wells Fargo Asia Ltd. v. Citibank,*[88] in which the district court held that under the general corporate law of the Phillipines, obligations incurred at a branch are obligations of the bank as a whole.

In *Perez,* the court qualified its holding by stating: "Only when a debt or other obligation is not payable at all in the confiscating state would the act of state doctrine be inapplicable."[89] In *Garcia,* as pointed out, a jury rendered a verdict favorable to the Cuban depositors; there was "a contractual undertaking to ensure the safety" of the depositors.[90] Here, we do not say that the plaintiffs' certificates could not be cashed in Cuba or that the holder of the certificates may collect the amount of the deposit simply because the certificates permitted collection at any Chase branch anywhere in the world.

We conclude from our review of the decisions and the commentaries that the act of state doctrine has its limitations. Indeed,

when the officers of a branch bank in a foreign country represent that a bearer certificate is guaranteed by the parent bank and will be paid at any branch in the world, and when it is evident to the bank officials that the bearer intends presenting it for payment outside of the foreign country where the branch is located, the bank's actions may amount to a separate guarantee that the deposit will be paid despite government expropriation of the deposit. *See Garcia.* The facts relating to the purchase of the certificates will, of course, be determined at trial. Here we hold that the statute of limitations on the parent bank's indebtedness begins to run from the date of demand.

## VI.

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

---

**87.** 61 N.Y.2d 460, 474 N.Y.S.2d 689, 463 N.E.2d 5 (Ct.App.1984), *cert. denied,* 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984).

**88.** 660 F.Supp. 946 (S.D.N.Y.1987), *remanded* 847 F.2d 837 (2nd Cir.1988), *on remand,* 695 F.Supp. 1450 (S.D.N.Y.1988). On remand, the district court concluded that New York law applied. The case is now pending on appeal.

Unlike the instant case there was no explicit guarantee of payment at any branch bank in the world.

**89.** 474 N.Y.S.2d at 693.

**90.** 735 F.2d at 651.

- APPENDIX

# The Chase Manhattan Bank

XXX XXXX AP-NO. 0001-M

CABLE CHAMANBANK
HABANA BRANCH
AGUIAR 310

MARIANAO Habana, Cuba

SON. VEINTICINCO MIL PESOS MONEDA NACIONAL $25.000.00
CERTIFICADO DE DEPOSITO A PLAZO FIJO AL PORTADOR

THE CHASE MANHATTAN BANK, Sucursal de Ave. 51 #12802, Marianao, Habana, hace

constar que en esta fecha se ha constituido en poder del Banco, en depósito a

favor del portador del presente certificado, con sujeción a lo dispuesto en el

párrafo 2do. del Artículo 113 de la Ley No. 13 de 23 de Diciembre de 1948 y sus

Reglas Complementarias dictadas por el Banco Nacional de Cuba, la cantidad de

$25,000.00 (Veinticinco mil NO/100 pesos) que le será devuelta al tenedor de

este certificado, a la presentación del mismo, en Junio 30, 1959, más los

intereses al 3½% (tres y medio por ciento) anual, con igual vencimiento.

El depósito que representa este certificado es transmisible por la simple

entrega o tradición del propio certificado, y cesará de devengar intereses desd

su vencimiento.

Marianao, 30 de Diciembre de 1958.

THE CHASE MANHATTAN BANK

FIRMA AUTORIZADA

FIRMA AUTORIZADA

---

APPENDIX

The plaintiffs translate this as follows:

## THE CHASE MANHATTAN BANK

Cable: CHAMANBANK
 Habana Branch
 Aguilar 310

AP NO. 001
HABANA, CUBA

SON. TWENTY FIVE THOUSAND PESOS
NATIONAL CURRENCY $25,000.00

BEARER <u>FIXED TERM</u> CERTIFICATE OF DEPOSIT

THE CHASE MANHATTAN BANK, Aguilar No. 310 Branch, makes the representation that on this date there has been established under the control of the Bank, on deposit in favor of the bearer of this certificate, under that stated in paragraph two of article 115 of Law No. 13 of December 23, 1948 and its complementary Regulations issued by the National Bank of Cuba, the sum of $25,000.00 (Twenty Five Thousand no/100 pesos) which shall be returned to the holder of this certificate, on demand of same, on June 30, 1959, plus interest at 3½% (three and a half per cent) yearly, with same demand. The deposit which is represented by this certificate is transferred by the mere delivery or handing over of the certificate itself, and it shall cease accruing interest upon its demand.

Habana, December 29, 1958.

THE CHASE MANHATTAN BANK

AUTHORIZED SIGNATURE

AUTHORIZED SIGNATURE

The Certified Court Interpreter to whom Chase submitted a certificate translated it as follows:

THE CHASE MANHATTAN BANK, Ave. 51 Branch, Marianao, Habana, attests that on this date the amount of $25,000.00 (Twenty Five Thousand Pesos and N0/100) has been constituted in favor of the bank, in deposit in favor of the holder of this certificate, subject to the provisions of paragraph 2, Article 115 of Law No. 13 of December 23, 1948 and its Complementary Rules issued by the Banco Nacional de Cuba, *which amount* shall be returned to the holder of this certificate, *upon presentation of the same*, on June 30, 1959, plus the interests at 3½% (three and a half percent) per annum, with *similar due date.* The deposit represented by this certificate is transferable by the mere delivery or transfer of the certificate itself, and it shall stop earning interests as of its *due date."*

(Emphasis added in each translation.)